No. 1061. TEAGUE ET AL. *v.* REGIONAL COMMISSIONER OF CUSTOMS, REGION II, ET AL. C. A. 2d Cir. Certiorari denied. *Henry Winestine, Osmond K. Fraenkel, Melvin L. Wulf,* and *Alan H. Levine* for petitioners. *Solicitor General Griswold* for respondents. ▮▮▮▮▮▮▮▮▮

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

This case presents a highly important question under the First Amendment, namely, whether, as the court below held, American citizens can be required to apply to the Treasury Department's Office of Foreign Assets Control for a license in order to receive magazines, films, or other publications sent to them from mainland China, North Korea, or North Vietnam. The decision of the Court of Appeals may well be inconsistent with *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965), in which we recently invalidated a somewhat similar regulation of the Post Office Department. Nevertheless, the Court denies certiorari here. It seems plain that the sole explanation for the Court's action is the fact that the petition for certiorari, having been delayed by an unusually severe snowstorm, arrived here two days after the 90-day period allowed for seeking certiorari, 28 U. S. C. § 2101 (c), would normally expire. Because I think the important First Amendment issue in this case demands consideration by this Court, and because I cannot accept the Court's interpretation of § 2101 (c), which penalizes petitioners for a snowstorm, an act of God, I must dissent.

I.

Petitioners are addressees of mail packages containing publications originating in China and North Vietnam. When these packages reached the United States they were detained by the Commissioner of Customs pursuant

to the Foreign Assets Control Regulations, 31 CFR § 500.808. The Commissioner then sent notices to petitioners, advising them that this mail would be released only if licenses were obtained from the Office of Foreign Assets Control. Petitioners did not apply for licenses but instead brought this suit, claiming that the regulations were unconstitutional. Their primary claim was and is that the regulations, by authorizing customs officials to refuse delivery under some circumstances and by requiring in all cases that the addressees submit to the cumbersome and time-consuming licensing process, abridged their First Amendment rights to receive published material.

The decision below, upholding these regulations, seems difficult to reconcile with our recent decision in *Lamont, supra.* In that case we held unconstitutional a Post Office regulation that required addressees of "communist political propaganda" to notify the Post Office explicitly of their desire to receive such publications in order to obtain delivery. We stated that the fatal flaw of the scheme was that "it requires an official act (*viz.,* returning the reply card) as a limitation on the unfettered exercise of the addressee's First Amendment rights." 381 U. S., at 305. In the present case the burden imposed on addressees is, if anything, far greater than that involved in *Lamont.* The addressee is not merely required to fill out and return a reply card, after which the magazine will automatically be sent. In the present case something quite different is required. The addressee must fill out a detailed license application and file it in duplicate.[1] He has no assurance that his application, once filed, will be granted, and in fact the regulations provide only general guidance as to the factors that will be considered in determining whether to

---

[1] 31 CFR § 500.801 (b) (2).

grant a license.[2]   Processing of the application normally requires about 10 days, according to the Government, but this period, which is itself not inconsiderable, may in fact represent only the minimum delay.[3]

Only one justification is suggested for the very severe prior restraint on First Amendment rights that results from this licensing scheme.   The Court of Appeals said that the regulations are permissible as a means of restricting the flow of American currency to designated foreign countries determined to be hostile to the United States.   Petitioners, on the other hand, argue broadly that they have a right under the First Amendment to purchase publications from any source of their choosing, even a country with which we might be at war.   It may not, however, even be necessary to reach this important question because there is considerable doubt whether

[2] 31 CFR § 500.204 App. (108) (1969) provides as follows:

*"Publications and films from China, North Korea and North Viet Nam.*   Publications and films originating in mainland China, North Korea or North Viet Nam are licensed for commercial importation provided all payments due to the suppliers are made into blocked accounts.   Publications and films originating in mainland China, North Korea, and North Viet Nam are also licensed without restrictions as to method of payment under programs approved by the Librarian of Congress or the National Science Foundation for universities, libraries, research and scientific institutions.   Such publications and films are also licensed in exchange for publications from the United States.   Additionally, such publications and films are licensed when the Office of Foreign Assets Control is satisfied that they are bona fide gifts to the importers and that there is not and has not been since the effective date any direct or indirect financial or commercial benefit to designated countries or nationals thereof from the importations."

[3] After the commencement of this suit, petitioner Pollin applied for a license and after waiting four weeks received only a request for additional information; the license was finally granted after a total delay of eight weeks.   Similarly, petitioner Teague waited five weeks after submitting a license application, only to receive a request that he answer an additional number of detailed questions; he did not pursue the matter further.

the regulations relating to publications can be considered necessary for preventing the outflow of American currency. Other regulations promulgated under the President's emergency power to control transactions in foreign exchange, 40 Stat. 415, as amended, 50 U. S. C. App. § 5 (b), broadly prohibit the making of any payments directly or indirectly to the designated foreign countries or their nationals by any person or corporation subject to the jurisdiction of the United States, regardless of how such payments are effectuated and regardless of whether the banks or other institutions serving as intermediaries are located in third countries. 31 CFR § 500.201. Violation of these regulations is a felony punishable by heavy penalties. 50 U. S. C. App. § 5 (b)(3). Although the licensing provisions related to publications may make it more difficult to evade this direct prohibition against foreign exchange transactions with the designated countries, such incidental benefits in the enforcement of even a permissible governmental policy ordinarily do not justify infringement on First Amendment rights. Cf. *Smith* v. *California,* 361 U. S. 147 (1959). In addition, the regulations explicitly permit the purchase of publications from these countries "without restrictions as to method of payment" in the case of universities, libraries, research, and scientific institutions acting under programs approved by the Librarian of Congress or the National Science Foundation. 31 CFR § 500.204 App. (108). The additional demand for these publications by private parties may be insignificant compared to the volume of transactions the Government has chosen to permit in the case of "approved" institutions. In fact, the remaining potential dollar outflow, and especially the part of it that would not be checked by the general prohibitions relating to foreign exchange transactions, may be so insubstantial that the only significant effect of the regulations would

be to choke off the flow of these publications to readers who would not actually pay for them but who may not take the trouble to fill out the required forms or who may not be able to establish, to the satisfaction of the Government's licensing officials, that the publications involved were in fact gifts. Under these circumstances, the regulations involved here surely raise a serious First Amendment question that should be heard and decided by this Court.

## II.

The only apparent explanation for the Court's denial of certiorari in this case is the fact that the petition arrived here two days after the 90-day period allowed by 28 U. S. C. § 2101 (c) for seeking certiorari in a civil case would normally have expired. The circumstances under which this occurred are these. The judgments sought to be reviewed were entered on November 14, 1968, and the 90-day period therefore expired on Wednesday, February 12, 1969. The petition for certiorari, along with the required number of copies, was sent from New York City by first-class mail at about noon on Monday, February 10. A severe snowstorm had hit New York City the night before, causing considerable disruption of many services including, as it turned out, the mails. Counsel for petitioners no doubt anticipated that some delay might possibly result from the storm, but since first-class mail from New York normally reaches Washington overnight, they could not have anticipated that it would take more than the remaining two and one-half days for their petition to arrive. In fact, however, the petition took four days to reach Washington and was docketed here on Friday, February 14, 1969.

The statute governing the time for seeking certiorari in a civil case, 28 U. S. C. § 2101 (c), provides that a petition for review of any judgment or decree "shall be taken or applied for within ninety days after the entry

of such judgment or decree." It is suggested by the Solicitor General, on behalf of respondents here, that this statute is "jurisdictional," and that we must follow it. I agree, of course, that we should follow the statute. But we must first determine what the statute means. Commentators and this Court alike have often said that the statute is "jurisdictional," and no doubt this statement is true in certain senses of that term. But the statement certainly is not true if it is intended to suggest that the statute deprives this Court of all power to hear cases filed after the 90-day period, regardless of whether the delay was caused by snowstorms making the transportation of the mails impossible. Under no known principle of statutory construction can such an interpretation of § 2101 (c) be supported. Nor have I been able to find any case interpreting the statute in this way. Although many cases repeat the "jurisdictional" formula, none of them that I have found involved situations where the delay was wholly caused by circumstances entirely beyond the petitioner's control. In fact, many of the early cases interpreting Rev. Stat. §§ 997 and 1008, the predecessors of § 2101 (c), made clear that this Court had power to waive the time requirement of these provisions under appropriate circumstances.[4] In recent years this Court has on occasion granted certiorari and decided on the merits civil cases that had been filed after the 90-day period, without making any mention of the time question. See, e. g., Ray v. Pierson, 386 U. S. 547 (1967) (No. 94, October Term, 1966).

In addition, we have squarely adopted this approach in interpreting several related statutes. The provision governing direct appeals to this Court from a district court, now § 2101 (a), provides that "[t]he record shall

---

[4] See, e. g., Grigsby v. Purcell, 99 U. S. 505, 506–507 (1879); Richardson v. Green, 130 U. S. 104, 111 (1889); Green v. Elbert, 137 U. S. 615, 621–623 (1891).

be made up and the case docketed within sixty days from the time such appeal is taken under rules prescribed by the Supreme Court." The Court held, under circumstances much less compelling than those present here, that this provision did not eliminate our power to hear appeals docketed after the 60-day period, noting that "[i]t will not expedite determination of constitutional questions to dismiss appeals because of errors of practice." *United Public Workers* v. *Mitchell,* 330 U. S. 75, 86 (1947). The cases deciding the timeliness of an appeal to the court of appeals have reached the same result under statutes that were even more clearly phrased in mandatory terms, and did not explicitly include even an indirect reference to a judicial rule-making power on the subject. *E. g., Georgia Lumber Co.* v. *Compania,* 323 U. S. 334 (1945); *R. F. C.* v. *Prudence Group,* 311 U. S. 579 (1941).

As all these cases show, the Court's Draconian interpretation of the statute is not supported by our prior decisions. Nor does the language of the statute itself dictate the Court's result. The statute does not say explicitly that the time limitation may be inapplicable under certain extenuating circumstances, but it also does not say that the time limit must be ruthlessly applied in every conceivable situation, without regard to hardships involved or extenuating circumstances present. The Court therefore must decide what is the more sensible interpretation of the statute. I for one cannot think of any purpose Congress might have had that could possibly be served by holding that a litigant can be defeated solely because of a delay that was entirely beyond his control. As we stressed in the *R. F. C.* case, *supra:*

"If that were true, the existence of the right to appeal would be subject to contingencies which no

degree of diligence by an appellant could control. Ambiguities in statutory language should not be resolved so as to imperil a substantial right which has been granted." 311 U. S., at 582.

It might be well to imagine for a moment what would have happened if some Senator or Representative had suggested an amendment to "clarify" the proposed § 2101 (c) by stating that a petition filed after the 90-day period will not be out of time "when the delay is caused solely by an interruption of the mail service due to snowstorms." It is conceivable that more than a few members of Congress would consider such an amendment an insult to this Court's intelligence and would feel it unnecessary to lead this Court by the hand on such matters of elementary common sense. It is impossible, however, to believe that any of them would have regarded an amendment to the opposite effect as properly reflecting the purpose of the statute, and yet this opposite amendment, ruling a petition out of time under these circumstances, is precisely the amendment that the Court today tacitly engrafts onto § 2101 (c).

I would not adopt any such pointlessly harsh interpretation of the statute, one that furthers no congressional objective whatsoever and denies litigants their opportunity to seek review in this Court on the basis of atmospheric events wholly beyond their control. This is a return to all the cruel technicalities of common-law pleading, and then some. I would grant certiorari and hear argument on the vital First Amendment issues at stake in this case.

Mr. Justice Harlan would also grant certiorari, but would postpone the question of jurisdiction to consideration of the case on the merits.