CHENG YIH–CHUN, Plaintiff-Appellant,

v.

The **FEDERAL RESERVE BANK OF NEW YORK** and the Secretary of the Treasury of the United States, Defendants-Appellees.

No. 709, Docket 35075.

United States Court of Appeals, Second Circuit.

Argued March 31, 1971.

Decided April 28, 1971.

Allan Zelnick, New York City (Sanders I. Epstein, New York City, of counsel), for plaintiff-appellant.

Bruno A. Ristau, Atty., Dept. of Justice, Washington, D. C. (L. Patrick Gray III, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C.; Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, of counsel), for defendants-appellees.

Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

Plaintiff Cheng Yih-Chun appeals from an order of the District Court for the Southern District of New York, which granted defendants' motion for summary judgment in an action arising under the Foreign Assets Control Regulations, 31 C.F.R. Part 500. The somewhat complicated factual setting is as follows:

In 1949, Cheng's father died in Shanghai, China. His assets included some $62,000 on deposit with the Irving Trust Company in New York. He was survived by a wife and four children living in Shanghai (the "Shanghai heirs") and a fifth child, Cheng, residing in

Hong Kong. During the administration of the New York estate of Cheng's father, the Irving Trust Company was appointed administrator and, pursuant to order of the New York County Surrogate's Court, the estate funds were deposited with the Treasurer of New York City subject to further order of the court.

On December 17, 1950, the Secretary of the Treasury (hereafter "the Secretary")—acting pursuant to § 5(b) of the Trading With The Enemy Act, 50 U.S.C. App. § 5(b), and Executive Order 9193—issued the Foreign Assets Control Regulations, 31 C.F.R. §§ 500.101 et seq. So far as here relevant, the thrust of the regulations was to prohibit—except as licensed by the Secretary—any transaction involving "property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 500.201(a). The accompanying schedule listed China as a "designated foreign country" as of December 17, 1950, the so-called "freezing date." Thus, on December 17, 1950, Cheng's relatives in Shanghai became nationals of a "designated foreign country," and thereafter a purported transfer of their interests in any property subject to the jurisdiction of the United States would be null and void unless licensed by the Secretary. 31 C.F.R. § 500.203(a). By virtue of his residence in Hong Kong, Cheng himself did not become a "designated national" but rather was an "unblocked national," and transfers of property in which he held an interest subsequent to the freezing date were exempt from the licensing requirement. 31 C.F.R. §§ 500.506, 500.322, 500.307.

█ In 1959, Cheng secured permission of the Surrogate's Court to withdraw his one-sixth distributive interest in the estate, and the Secretary licensed the withdrawal—a procedure which now seems to have been unnecessary although unobjectionable. Long before that, the transaction around which much of this controversy centers had taken place. On April 27, 1950—before the China freezing date—Cheng and his Shanghai relatives executed before the British Vice-Consul in Shanghai a document termed "Power of Attorney" in which the Shanghai heirs purported to appoint Cheng their "true and lawful attorney" with full power to represent their interests in the New York estate of their deceased father. More than thirteen years later, in November and December, 1963, Cheng and the Shanghai heirs exchanged reciprocal letters by which the Shanghai heirs purported to release to Cheng all their interest in their father's New York estate in return for Cheng's surrendering to them all his interest in the Shanghai estate. Since this transaction occurred after the freezing date and was not licensed by the Secretary, it was a nullity in so far as it purported to vest in Cheng the Shanghai heirs' interest in the New York estate.

In May, 1964, Cheng made the first of several applications to the Treasury Department for a license authorizing him to obtain payment of the remaining five-sixths of the New York estate. This application and requests for reconsideration were denied, apparently pursuant to Treasury policy of denying "all requests for transfer of blocked property based on post-freezing transfers, and to deny requests for transfers based on alleged pre-freezing transfers in the absence of sufficient proof that such transfer occurred prior to the effective date of the Regulations."

Nothing daunted, Cheng, in 1966, petitioned the New York County Surrogate's Court for an order authorizing his withdrawal of the remaining five-sixths of the estate funds deposited for the benefit of the Shanghai heirs. Cheng's petition, which was opposed by the Public Administrator of New York County, was initially denied by Surrogate DiFalco who appears to have viewed the unlicensed 1963 exchange of letters as the basis for Cheng's claim. However, upon motion for reconsideration, the Surro-

gate recalled his prior decision, ruled that the April 1950 Power of Attorney had vested in Cheng the beneficial use of the entire New York estate, and ordered that the estate funds on deposit with the New York City Treasurer be subject to Cheng's beneficial use and payable to him upon his presentation of a Treasury license.

With the Surrogate's decision in hand —indeed, even before the Surrogate's order had been entered—Cheng renewed his applications for a Treasury license, coupling his request with a plea that he at least be authorized to receive $100 per month from the estate pursuant to 31 C.F.R. §§ 500.508 and 500.521. Despite Cheng's presentation of the Surrogate's order, these applications, too, were denied in accordance with the Secretary's continued belief that Cheng had adduced insufficient proof that the Shanghai heirs had released all their interests in the New York estate prior to the freezing date.

Cheng thereupon brought this action in the District Court for the Southern District of New York, praying for a judgment that his interest in the New York estate was not subject to the Foreign Assets Control Regulations or directing the Secretary to issue a license authorizing transfer of the funds to him or declaring the Regulations to be unconstitutional. Believing that the Secretary and Federal Reserve Bank were not bound by the Surrogate's decision rendered in an action to which they were not parties, Judge Wyatt found that the April, 1950 Power of Attorney did not effect a transfer of the Shanghai heirs' interest to Cheng and that, being unlicensed, the attempted transfer evidenced by the 1963 exchange of letters was "null and void." He also rejected Cheng's claims that the Secretary had abused his discretion in refusing the license or that the Regulations were unconstitutional. Accordingly, he granted the Secretary's motion for summary judgment.

The point Cheng presses most strenuously is that the New York Surrogate's Court was empowered to determine ownership of estate property found within its jurisdiction and that this determination was binding upon the Secretary in the subsequent federal court litigation. Since the Secretary was not a party to the Surrogate's proceeding and, indeed, had not even been given notice of it or invited to present his views, principles of *res judicata* and collateral estoppel do not preclude him from contesting the Surrogate's ruling in subsequent federal litigation. Nevertheless, loudly invoking the principles of an orderly federal-state relationship and asserting that a federal district court has neither original nor appellate jurisdiction over the administration of a New York estate, Cheng contends the federal court should have respected the Surrogate's decision. The Secretary, for his part, piously defends Judge Wyatt's decision to disregard the Surrogate's determination; yet neither in the district court nor in his brief on appeal did he cite the one case that is controlling in his favor. That case, C. I. R. v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), presented the question "Whether a federal court or agency in a federal estate tax controversy is conclusively bound by a state trial court adjudication of property rights or characterization of property interests when the United States is not made a party to such proceeding." *Id.* at 456–457, 87 S.Ct. at 1778. The answer was as follows: "If there be no decision by [the state's highest court on a state law issue arising in federal litigation] then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Id.* at 465, 87 S.Ct. at 1783—and this even though an adversary had opposed the application resulting in the lower state court's ruling.

Applying *Bosch* to our case, Judge Wyatt was not concluded by Surrogate DiFalco's determination of the

effect of the April, 1950 Power of Attorney but was bound to consider, after giving "proper regard" to the Surrogate's decision, whether the law of New York was otherwise.[1] As a reading of the Power of Attorney, set forth in the margin,[2] discloses, the judge was altogether correct in deciding—contrary to the Surrogate's unexplained ruling—that New York would not recognize such a document as transferring to the appointee the beneficial interest of the appointing parties. Cf. In re Katz' Estate, 152 Misc. 757, 274 N.Y.S. 202 (Surr.Ct. Kings County 1934); Gaughan v. Nickoloff, 28 Misc.2d 555, 214 N.Y.S.2d 487 (Sup.Ct. Erie County 1961). See generally 2 N.Y.Jurisprudence: Agency §§ 64–73 (1958). Surely, a document in which the Shanghai heirs conferred on Cheng the power "to represent *on our behalf* our interests" in the New York estate did not effect a transfer of all their interest in the funds (emphasis added). That such a transfer was not intended in April, 1950 is highlighted by the text of the 1963 letter in which the Shanghai heirs declared: "[W]e hereby agree to give up our just right of claim [to the New York estate] to you * * *. Provided, in return, you should agree to give up your right of claim on all of the estate of inheritance remained [sic] in Shanghai * * * to us."[3]

Cheng goes on to assert that even if general principles of federalism and judicial comity do not compel the federal court to follow the prior Surrogate's determination, the Secretary's own regulation, 31 C.F.R. § 500.523, somehow insulates the Surrogate's decision from subsequent questioning in federal court. But that regulation—authorizing certain transactions incident to the administration of the blocked estate of a decedent—was obviously not intended as authority for state probate courts to make rulings affecting the applicability of the Foreign Assets Control Regulations which the Secretary could never subsequently contest even though he had not been a party to the probate proceeding. In any event, § 500.523, by its own terms, applies only to the administration of "blocked estates," and the estate of Cheng's father could be blocked only if the Shanghai heirs retained their interest in the estate beyond December

1. The parties appear to agree that the effect of the instrument is to be determined by the law of New York rather than of China. Judge Wyatt would naturally—and properly—have assumed that a New York court would so hold, see Wyatt v. Fulrath, 16 N.Y.2d 169, 264 N.Y.S.2d 233, 211 N.E.2d 637 (1965); and we see no reason here for a federal court's failing to follow New York's choice of law rule even though, in a federal question case, it might not have to do so.

2. KNOW ALL MEN BY THESE PRESENTS:
That we, Cheng Tai Yun-hsiang, Cheng Yih-chung [the plaintiff], Cheng Chien-kong, Cheng An-dien, Cheng An-chen, Cheng Zi-lee of Shanghai, China, Legal heirs of the late Mr. Cheng Sung-tung, hereby nominate and appoint one of us Mr. Cheng Yih-chung to be our true and lawful attorney with full power to represent on our behalf our interests concerning the deposit money of the late Mr. Cheng Sung-tung in the Irving Trust Company New York U. S. A. A/C No. 1–67 amounting to U. S. $62.482.00 (United States Dollars sixty two thousand four hundred and eighty two only) and for the purpose above mentioned to communicate with the said Irving Trust Company in either of the three following ways:
1. to draw out all of the deposit money under the said current account.
2. to change the original name and signature of the said current account into our attorney's.
3. to settle the whole matter in whatever manner as our attorney sees fit.
And we hereby undertake to ratify everything which our attorney or any substitute or substitutes or agent or agents appointed by him under the power in that behalf hereinbefore contained shall do or purport to do by virtue of these presents.

3. In light of the entire clarity of the documents there was no error in deciding the issue on a motion for summary judgment.

17, 1950—a position which Cheng steadfastly disavows. Hence, Cheng cannot invoke § 500.523 without calling for a reversal of the Surrogate on the merits.

■■ Cheng next argues that even if the five-sixths of his father's estate was properly frozen as of December 17, 1950, the Secretary's policy of denying all requests for release of blocked assets based on post-freezing transfers (here, the surrender letters of 1963) is arbitrary and capricious in that it does not relate to the congressional and executive policy behind the Act. That policy, as Cheng contends, is to deny hard currency to blocked countries and their nationals. However, as the Secretary points out, the purpose behind the Act is not only that but also to preserve the assets of such countries and their nationals for possible vesting and use in the future settlement of American claims against those governments and their citizens. See Propper v. Clark, 337 U.S. 472, 483–484, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949); Sardino v. Federal Reserve Bank, 361 F.2d 106, 112–113 (2 Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966); Nielsen v. Secretary of Treasury, 424 F.2d 833, 840 (D.C.Cir.1970); Sommerfield, Treasury Regulations Affecting Trade with the Sino-Soviet Bloc and Cuba, 19 Bus.Lawyer 861, 862 (1964). Measured against this purpose, the Secretary's policy is entirely reasonable.

■ This leads us to Cheng's contention that if the Regulations do authorize the Secretary's denial of a license in this manner, they amount to an unconstitutional taking of property without due process. We note first that Cheng's standing to raise this point is highly questionable. Since he failed to acquire a beneficial interest in the portion of the estate here at issue either by the April, 1950 Power of Attorney or the unlicensed reciprocal surrender letters of 1963, Cheng does not really have an interest in the property whose blockage he attacks as unconstitutional. The Shanghai heirs who are unable either to obtain or validly transfer the estate funds would appear to be the proper parties to complain of the freeze. In any event, the constitutional validity of the blocking regulations has already been established in this circuit. See Sardino v. Federal Reserve Bank, *supra*, 361 F.2d 106; cf. Teague v. Regional Commissioner of Customs, 404 F.2d 441, 445 (2 Cir. 1968), cert. denied, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969). Cheng's reliance on Nielsen v. Secretary of Treasury, *supra*, 424 F.2d 833, is misplaced, for the *Nielsen* court upheld the constitutionality of the Cuban Assets Control Regulations. Any suggestion in that decision that an indefinite blocking might be treated for due process purposes as the equivalent of a vesting was directed to the possible objections that unblocked shareholders of a corporation which was itself a "designated national" might raise in an appropriate case. The due process and statutory issues there would be more substantial because the property affected might be viewed, on some sort of piercing-the-corporate-veil scheme of analysis, as belonging not to the corporation which was a designated national but to its unblocked shareholders. Cf. Kaufman v. Societe Internationale, 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 2d 853 (1952). No such problem is presented here for, as we have already made clear, on the December 17, 1950 freezing date, the funds at issue unequivocally belonged to the Shanghai heirs.

■ We arrive finally at Cheng's contention that at the very least, he is entitled to receive payment of $100 per month from the blocked account pursuant to 31 C.F.R. § 500.521. However, once again it is the Shanghai heirs, not Cheng, who should invoke § 500.521 if anyone can—an issue on which we express no opinion. For that section authorizes $100 per month remittances to be made from blocked domestic accounts to foreign payees only when the blocked account is one "in the name of, or in which the beneficial interest is held by, the payee or members of his household."

Since the Shanghai heirs are not members of Cheng's "household," 31 C.F.R. § 500.521(d), and the beneficial interest in their share of the account never validly passed to Cheng, he does not qualify to receive any payments under that section.

Judgment affirmed.