**Maria del Carmen Llanso de REAL et al., Plaintiffs-Appellants,**

v.

**William E. SIMON, as Secretary of the Treasury of the United States of America, et al., Defendants-Appellees.**

**No. 74–1747.**

United States Court of Appeals, Fifth Circuit.

March 27, 1975.
Rehearing and Rehearing En Banc Denied 510 F.2d 738.

See 514 F.2d 738.

558

Joseph A. McGowan, Miami, Fla., for plaintiffs-appellants.

Robert W. Rust, U. S. Atty., Clemens Hagglund, Asst. U. S. Atty., Miami, Fla., William B. Saxbe, Atty. Gen., William Olson, Asst. Atty. Gen., Robert L. Keuch, Benjamin C. Flannagan, Thaddeus B. Hodgdon, Jonathan B. Smith, Attys., U. S. Dept. of Justice, Washington, D. C., John J. O'Neill, Law Dept., New York City, for defendants-appellees.

Before BELL, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

This case requires us to undertake the difficult task of resolving a conflict regarding the rights to assets located in the United States blocked by the Secretary of the Treasury but claimed by former Cuban nationals now residing in the United States. Appellants seek to have us reverse the decision of the district court, asserting the property rights of Cuban nationals who have sought refuge in this country from an oppressive, dictatorial regime. The Government of the United States, however, would have us affirm the trial court's judgment on the basis of the important national interest inherent in the conduct of this country's foreign affairs.

Appellants are the surviving heirs of Urbano Real, a Cuban national who died intestate on December 2, 1965, while still a citizen and resident of Cuba. Maria del Carmen Llanso de Real, the widow of Urbano Real, came to this country in June of 1966 after the death of her husband, and presently is an alien residing in Miami, Florida. Mercedes Real de Carillo is the daughter of Urbano Real. She is a naturalized citizen of the United States, and also resides in Miami. Maria Pantin Vitier and Suzanne Pantin Freyre are both granddaughters of Urbano Real, and are daughters of a deceased daughter of Real. Both granddaughters are naturalized citizens of the United States and reside in Miami.

Prior to July 8, 1963, Real and his wife were the joint holders of a securities account with Merrill Lynch, Pierce, Fenner and Smith, a brokerage firm with offices in Miami, Florida. On July 8, 1963, this account, along with all other assets in the United States owned by the Cuban government or Cuban nationals,

was frozen or "blocked" by promulgation of the Cuban Assets Control Regulations of the Treasury Department, 31 C.F.R. Part 515. These regulations prohibit the transfer, sale or any other transaction regarding such assets without a license issued by the Treasury Department. See 31 C.F.R. § 515.201 (1974). This action by the United States Government blocked, as of July 8, 1963, $148.8 million of Cuban assets in the United States. It has been the policy of the United States to allow Cuban refugees arriving in this country or taking up residence elsewhere to obtain their blocked assets. Though Urbano Real's family came to this country, Real himself did not or could not leave Cuba.[1] After Real died in Cuba in 1965, his wife left that country for the United States, where she joined her family.

After Mrs. Real arrived in the United States, she attempted to gain possession of the blocked securities account. Mrs. Real was able to obtain a license from the Treasury Department on January 25, 1967, giving her title and possession of one-half the Merrill Lynch securities account, which was her entitlement under the community property law of Cuba. Partial unblocking of the account was authorized under 31 C.F.R. § 515.525 (1974). The other half of the securities account (of the value in excess of $80,-000), however, remains blocked, and is the subject of this litigation.

As indicated previously, Urbano Real died without leaving a will. On August 18, 1971, the County Judge's Court of Dade County, Florida, ordered and adjudged that the four plaintiffs in this case were the sole heirs of Urbano Real. The judgment declared that each of the granddaughters was the owner of one-sixth of the estate, and that Real's wife and daughter were each the owners of one-third.

Subsequently, the appellants sought a license from the Treasury Department which would give them their respective shares of the still-blocked portion of the securities account. On September 20, 1971, the Treasury Department granted restricted licenses to the parties, which allowed transfer of the account to the names of the appellants, but required that "the securities remain in a blocked account with the decedent's interest shown." This action continued the blocked status of the fund. Appellants' request for an unrestricted license was formally denied on October 22, 1971. This litigation then followed, with the purpose of requiring the Treasury Department to issue appellants an unrestricted license for Urbano Real's securities—in effect, to give each person sole possession and control of her respective share of Urbano Real's estate.

The district court upheld the Treasury Department's refusal to unblock the remaining portion of the securities account. The court rejected appellants' contention that the Treasury's actions were unauthorized or that they constituted an unconstitutional deprivation of property without due process of law in violation of the Fifth Amendment. We reverse the district court's judgment and hold that appellants are entitled to an unrestricted license which will enable each party freely to transfer or dispose of her portion of the securities account.

I. The Statutory Authorization for the Cuban Assets Control Regulations.

 Appellants' first contention is that the Cuban Assets Control Regulations are void as applied to them because the regulations lack express congressional authorization. The Government contends that the statutory basis for the regulations is the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq. The operative provision of the Trading with the Enemy Act is section 5(b), which provides, in part, that:

> (b)(1) During the time of war or during any other period of national

---

1. In a letter contained in the original record, Real's granddaughter states that Real was unable to leave Cuba due to a heart ailment and medical advice against undergoing the travails involved in departing the country. However, the letter also states that Real and his wife were making preparations to leave the country at the time of his death.

emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

. . . . .

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States . . ..

This nation is under a declaration of national emergency insofar as the Trading with the Enemy Act is concerned, and has been continually since President Truman declared a national emergency in 1950 due to events in Korea. See Exec. Order No. 10896, 25 F.R. 12281 (1960); Exec.Order No. 10905, 26 F.R. 321 (1961); Exec.Order No. 11037, 27 F.R. 6967 (1962); Sardino v. Federal Reserve Bank of New York, 2 Cir., 1966, 361 F.2d 106, 109, cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130. Thus, as the Second Circuit in *Sardino* specifically held, the Cuban Assets Control Regulations are authorized under the Trading with the Enemy Act. See Nielsen v. Secretary of Treasury, 1970, 137 U.S. App.D.C. 345, 424 F.2d 833, 837–838; see also Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949).

Appellants contend, however, that an intervening Act of Congress has limited the scope of permissible governmental action regarding Cuba. They argue that the Foreign Assistance Act of 1961, Public Law 87–195, Sept. 4, 1961, 75 Stat. 424 has narrowed the range of economic sanctions Congress intended to impose on Cuba. Section 620(a) of that Act provides:

Sec. 620. Prohibitions Against Furnishing Assistance to Cuba and Certain Other Countries.—

(a) No assistance shall be furnished under this Act to the present government of Cuba. As an additional means of implementing and carrying into effect the policy of the preceding sentence, the President is authorized to establish and maintain a *total embargo upon all trade* between the United States and Cuba.

75 Stat. 444–445 (emphasis added). Section 621 of the Foreign Assistance Act of 1961 deals with the delegation of administrative responsibilities, and provides:

Sec. 621. Exercise of Functions.—

(a) The President may exercise any functions conferred upon him by this Act through such agency or officer of the United States Government as he shall direct. The head of any such agency or such officer may from time to time promulgate such rules and regulations as may be necessary to carry out such functions . . ..

75 Stat. 445. Appellants' contention is that the 1961 Act, being later in time than the Trading with the Enemy Act, impliedly modifies that Act, and restricts American governmental action against Cuba to a trade embargo. Since the unblocking of these assets would not impinge upon a trade embargo, it is then reasoned, the regulations are contrary to the authorizing statute.

Appellants do not cite, nor have we been able to locate, any portion of the legislative history of the 1961 Act that would indicate either an explicit or implicit intention on the part of Congress to limit Executive attempts to respond to the Cuban crisis. Absent clear and unequivocal evidence of such intent, we are unwilling to announce a limitation on the President's powers to conduct the foreign affairs of this country. Cf. Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963); Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). We find

no inconsistency in the two acts, and believe that the Foreign Assistance Act of 1961 should be viewed as bolstering, rather than limiting, the powers of the Executive Branch to deal with the Cuban problem. Our conclusion that the regulatory scheme in general has statutory authorization does not, however, decide the issue whether the application of the regulations to the unique facts of this case is consistent with the legislation from which the regulations derive their power.

II. Are the Regulations, As Applied to Appellants, Authorized by the Trading with the Enemy Act?

No case yet decided has considered the factual circumstances presented in this case. Involved are three American citizens and one lawfully admitted resident alien[2] who are the sole survivors of a deceased Cuban national, and who claim ownership of securities held in the United States. There is no contention by the United States that the Cuban government has any right or claim to this property, nor is there any assertion that any person in Cuba has any interest in the property. Section 5(b) of the Trading with the Enemy Act, relied on by the Government as the source of its power to block the account in question, gives the President power to prevent the transfer or withdrawal of any property subject to the jurisdiction of the United States "in which any foreign country or a national thereof has any interest . . . ." Reference to the decisions upholding the application of the regulations in question emphasizes the important differences between previous cases and the present one.

In *Sardino, supra,* a Cuban national residing in Havana claimed funds in a blocked account in the United States. Since a Cuban national obviously had an interest in the blocked funds, the Second Circuit was clearly right in holding that this was a situation to which the statute applied so as to prohibit the transfer or disposal of Cuban assets. If Urbano Real were alive and residing in Cuba, the transfer of funds in an account in the United States held by him could be prohibited under the authority of *Sardino.* In *Nielsen, supra,* three Cuban refugees[3] owned 750 out of 1,000 shares of a Cuban corporation. The corporation had funds in an American account, and the three plaintiffs unsuccessfully sought their proportional share of account. However, 25 per cent of the shares of the corporation were still owned by Cuban nationals, and the court noted that it would have to disregard "the corporate entity and national character of the Cuban corporation owning the assets" in order to conclude that neither Cuba nor a Cuban national still had an interest in the corporate funds. See 424 F.2d at 842. If one of Urbano Real's heirs presently resided in Cuba, there would be an interest of a foreign national in the blocked account which might, under the *Nielsen* rationale, prevent transfer of any part of the blocked assets.

A case similar to *Nielsen* is Cheng Yih-Chun v. Federal Reserve Bank of New York, 2 Cir., 1971, 442 F.2d 460, decided under the analogous Foreign Assets Control Regulations, 31 C.F.R. Part 500. Cheng was a resident of Hong Kong; his mother and four brothers and sisters resided in Shanghai. Cheng's father died leaving $62,000 in a New York bank account. Cheng's family attempted to transfer their interest in the account to Cheng by giving him, prior to the date Chinese assets were blocked, a

---

2. The fact that Mrs. Real is a lawfully admitted resident alien of this country rather than a citizen is of no importance to her rights in this case, since it has been determined that "aliens lawfully within this country have a right to enter and abide in any State in the Union 'on an equality of legal privileges with all citizens under nondiscriminatory laws.' " Graham v. Richardson, 403 U.S. 365, 378, 91 S.Ct. 1848, 1855, 29 L.Ed.2d 534 (1971) (citation omitted).

3. None of the plaintiffs in *Nielsen* were citizens of the United States. One plaintiff was a resident of Costa Rica, and another was a resident of Nassau. The third plaintiff was the executor of the estate of a stockholder who had died while a resident of Puerto Rico.

Power of Attorney and relinquishing to him all their claims to the New York account. The district court held, however, that the Power of Attorney did not transfer the Shanghai heirs' interest to Cheng. Since Communist Chinese nationals still retained an interest in the blocked account, the Second Circuit upheld the Government's refusal to transfer the funds to Cheng.

In contrast to the preceding cases, however, there is no living person in the "designated foreign country" (Cuba) who retains an interest in the blocked account in question here. If neither the government of Cuba nor any person in Cuba has any interest or claim to the blocked property, the Trading with the Enemy Act would be inapplicable, because the Act states that the power to prohibit or license transfers of property in the United States applies only to "any property in which any foreign country or a national thereof has any interest . . . ." Trading with the Enemy Act, 50 U.S.C. App. § 5(b)(1)(B).

The Treasury Department apparently recognized this dilemma, because its reg-ulations attempt to circumvent the problem. The regulations define the term "blocked account" as "an account in which any designated national has an interest . . . ." 31 C.F.R. § 515.319 (1974).[4] The most important regulation bearing on this case, however, is 31 C.F.R. § 515.327 (1974), which defines a "blocked estate of a decedent." This provision says that an estate is blocked if any designated (Cuban) national has an interest therein, and goes on to state: *"A person shall be deemed to have an interest in a decedent's estate if he . . . was the decedent . . . ."*[5] Thus, the Government concedes that in order validly to block the account, a Cuban national must have an interest therein. But this prerequisite is satisfied in this case if, and only if, the regulation may validly hold that the decedent, Urbano Real, retains an interest in his estate after his death, since every other person with an interest in the estate resides in the United States.

■ In considering whether the Government may validly promulgate a regulation which deems a decedent to

4. The term "national" is defined in 31 C.F.R. § 515.302 (1974). All the definitions thereunder imply that a "national" is either a natural person or a business entity—there is no indication that a deceased person is within the definition.

31 C.F.R. § 515.302 (1974) provides as follows:

§ 515.302 National.

(a) The term "national" shall include:

(1) A subject or citizen of, or any person who has been within, a foreign country, whether domiciled or resident therein or otherwise, at any time on or since the "effective date."

(2) Any partnership, association, corporation, or other organization, organized under the laws of, or which on or since the "effective date" had or has had its principal place of business in a foreign country, or which on or since such effective date was or has been controlled by, or a substantial part of the stock, shares, bonds, debentures, notes, drafts, or other securities or obligations of which, was or has been owned or controlled by, directly or indirectly, a foreign country and/or one or more nationals thereof as defined in this section.

(3) Any person to the extent that such person is or has been, since the "effective date" acting or purporting to act directly or indirectly for the benefit or on behalf of any national of a foreign country.

(4) Any other person who there is reasonable cause to believe is a "national" as defined in this section.

(b) The Secretary of the Treasury retains full power to determine that any person is or shall be deemed to be a "national" within the meaning of this section, and to specify the foreign country of which such person is or shall be deemed to be a national. Appellants are licensed as "unblocked nationals" in that they are "resident in and within the United States," and are not classified as "specially designated national[s]." 31 C.F.R. § 515.505 (1974).

5. 31 C.F.R. § 515.327 (1974) provides as follows:

The term "blocked estate of a decedent" shall mean any decedent's estate in which a designated national has an interest. A person shall be deemed to have an interest in a decedent's estate if he (a) was the decedent; (b) is a personal representative; or (c) is a creditor, heir, legatee, devisee, distributee, or beneficiary.

have an interest in his estate, it is necessary also to consider the purposes behind the Trading with the Enemy Act and the Cuban Assets Control Regulations. The Government at oral argument described the purposes behind the regulations as being three-fold: (1) to deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States;[6] (2) to retain blocked funds for possible use or vesting to the United States should such a decision be made; and (3) to use blocked funds for negotiation purposes in discussions with the Cuban government.[7]

No contention is advanced here that appellants intend to use the blocked account for or on behalf of the Cuban government. If the United States had a reasonable basis to believe this were the case, it would be proper to deny appellants access to the blocked assets. Nor do we believe it logical to contend that the Government could use this fund as a tool to gain leverage in negotiations with the Cuban government. Cuba has no stake or interest in appellants' securities account and is not concerned with its disposition. Thus, the only national interest or purpose which can properly be advanced to support the Government's action is the second numbered reason described above. The Government argues that it might choose to use these blocked funds to provide compensation to Americans whose property was confiscated by the Cuban government, and that this court should not rule in a manner which would obviate the possibility of such a decision.[8]

The fact that a number of previous decisions found this argument persuasive, see note 8, *supra,* is not conclusive, for no previous case has involved a situation where all claimants to the blocked fund were American residents. This distinction is critical, because we have clear direction from Congress that it is not the intent of this country to use the property of one group of Americans to provide compensation to another group. In 1965, Congress was urged to pass legislation requiring the unblocking of Cuban assets which were in fact totally or substantially owned by Americans. The pressure for such legislation came in large part from Americans with interests in Cuban corporations who were unable to secure corporate assets held by these corporations in the United States. In addressing this appeal, which is essentially the same as appellants' claim, the Senate Foreign Relations Committee stated as follows:

. . . [T]he Committee on Foreign Relations recommends that upon application the Department of the Treasury examine with particular care each case *involving Cuban assets beneficially owned by American citizens* to determine whether those assets should continue to be blocked. In the com-

---

**6.** Another statement of this purpose is contained in Department of State Press Release 360, July 8, 1963, 49 Dep't of State Bull. 160 (1963): "Thus Cuba will be denied the use of American financial facilities for transfers of funds to Latin America for subversive purposes."

**7.** The purposes of the Cuban Assets Control Regulations were described by the chief counsel for foreign assets control as follows:

(1) isolating Cuba,
(2) protecting Cubans from having their assets in the United States confiscated by Cuban authorities,
(3) preserving Cuban assets for future disposition,
(4) implementing of our economic defense program by (a) denying Cuba access to dollar earnings and (b) denying Cuba access to dollar financial facilities.

Goodman, United States Government Foreign Property Controls, 52 Geo.L.J. 767, 793 (1964); see also Cheng Yih-Chun v. Federal Reserve Bank of New York, *supra,* 442 F.2d at 465.

**8.** The desire to preserve the assets of foreign countries and nationals for possible vesting and use in future settlement of American claims against those governments and their citizens has been an important factor in previous decisions dealing with blocked assets. See Propper v. Clark, *supra,* 337 U.S. at 483–484, 69 S.Ct. at 1340; Cheng Yih-Chun v. Federal Reserve Bank of New York, *supra,* 442 F.2d at 460; Nielsen v. Secretary of Treasury, *supra,* 424 F.2d at 840; Sardino v. Federal Reserve Bank, *supra,* 361 F.2d at 112–113; see also Sommerfield, *supra,* note 7, at 862.

**564**

mittee's view, *if the assets are wholly or substantially owned by citizens and residents of United States they should be unblocked,* since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban Government. This would be tantamount to using the property of one U. S. citizen to pay the claim of another U. S. citizen. (Emphasis added.)

S.Rep.No.701, 89th Cong., 1st Sess. (1965), U.S.Code Cong. and Admin.News, pp. 3581, 3585. See also the House Report on the subject of unblocking the Cuban assets of American residents.

While the committee does not recommend wholesale unblocking of all U. S. owned assets, it does recommend that a thorough examination be made by the Department of the Treasury on a case-by-case basis to determine from the evidence and equities involved in each case the proper disposition of U. S. national owned blocked assets and that, where proper, it unblock U. S. privately owned assets.

H.R.Rep.No.706, 89th Cong., 1st Sess. 7 (1965). Thus, it appears there is no intent on the part of Congress to require the Treasury to continue blocking funds lawfully claimed by American citizens where there is no Cuban interest in the assets.

■ With this perspective on the policies behind the blocking of Cuban assets, we return to the issue whether there is a sufficient interest on the part of the Cuban government or a Cuban national which would justify or authorize the application of the Trading with the Enemy Act and the Cuban Assets Control Regulations to the facts of this case. The Government claims there is such an interest, because the deceased, Urbano Real, retains an interest in his estate. But the real issue is whether the Government can validly, within the scope of the Trading with the Enemy Act, determine that a deceased person retains

an interest in his estate. We hold that such a determination by the United States is arbitrary and without basis in either the language or the purpose of the Trading with the Enemy Act.

■ There can be no doubt that the authority of an administrative agency to promulgate regulations is limited by the statute authorizing the regulations. Thus, an administrative agency "has no power to create a rule or regulation that is out of harmony with the statutory grant of its authority." Ruiz v. Morton, 9 Cir., 1972, 462 F.2d 818, 822, aff'd, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). As the Supreme Court has held, "When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted." Stark v. Wickard, 321 U.S. 288, 309–310, 64 S.Ct. 559, 571, 88 L.Ed. 733 (1944). "Administrative determinations must have a basis in law and must be within the granted authority." Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); see Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 1072–1073, 1075 (1974); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). The Government recognizes that a Cuban interest must pertain to the assets in order to justify blocking, and so by administrative fiat has decreed that deceased persons have an interest in their assets, thus justifying the blocking of their estates. The concept that a dead person is a "foreign national" in possession of property within the meaning of the Trading with the Enemy Act does not have the support of logic. Under the facts presented by this case, such a determination does not have the support of the congressional policies behind the Act. We conclude, therefore, that, under the facts and circumstances, the Government's determination that the deceased, Urbano Real, retains an interest in his estate which justifies withholding the assets from American citizens and residents has no

basis in law and must be set aside and annulled.

The Government's action in determining that the dead can reach beyond the grave to possess their worldly goods is akin to other agency actions that have been found to have no basis in law. In Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055 (1974), the practice of the Bureau of Indian Affairs of limiting assistance to Indians living *on* reservations was ruled invalid where the statute authorizing such assistance provided for aid to Indians "*throughout* the United States." In United States v. Minker, 350 U.S. 179, 76 S.Ct. 281, 100 L.Ed. 185 (1956), the Supreme Court examined the practice whereby the Immigration and Naturalization Service used their power to subpoena "witnesses" in denaturalization proceedings to subpoena the subject of the proceedings. The Court in *Minker* held that naturalized citizens who were the subjects of denaturalization proceedings were not "witnesses" within the meaning of a statute conferring power on immigration officers to require "witnesses" to testify before the Service. In Social Security Board v. Nierotko, *supra,* the Supreme Court held a determination of the Social Security Board that "back pay" was excluded from the meaning of "wages" under the Social Security Act to be beyond the permissible limits of administrative determination. In line with these cases, we conclude that the Secretary of the Treasury has exceeded his statutory authority in the interpretation and application of the Trading with the Enemy Act in such a manner as to deny these appellants their unrestricted interest in the estate of Urbano Real.

Reversed.