Napoleon RICHARDSON and Francisco Chaimowicz, as Executors of the Estate of Concepcion Brodermann Stuetzel, also known as Concepcion Brodermann, Plaintiffs,

v.

William E. SIMON, as Secretary of the Treasury of the United States, and the Bank of Nova Scotia, Defendants.

No. 76 C 537.

United States District Court,
E. D. New York.

Oct. 8, 1976.

Samuel Gursky, New York City, for plaintiffs.

David G. Trager, U. S. Atty. by Constance M. Vecellio, Asst. U. S. Atty., U.S. D.C., Eastern Dis. N. Y., Brooklyn, N. Y., Shearman & Sterling, New York City, for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendants have moved to dismiss the plaintiffs' complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds (i) that this Court lacks jurisdiction over the subject matter, or, in the alternative, pursuant to Rule 12(b)(6) on the grounds (ii) that the complaint fails to state a claim upon which relief can be granted. Plaintiffs have made a cross motion for summary judgment pursuant to Rule 56 on the ground that plaintiffs are entitled to a judgment as a matter of law.

## FACTS

The following facts have been admitted by the parties for the purposes of these motions:

Carl W. Stuetzel died intestate in Havana, Cuba, on August 24, 1965. Stuetzel's only heir-at-law, his wife Concepcion Brodermann Stuetzel, entered the United States as a permanent resident on October 13, 1969. Shortly thereafter, she applied for a license seeking release of certain assets held in a joint bank account in the Bank of Nova Scotia which had been frozen by the Secretary of the Treasury pursuant

to the Trading with the Enemy Act[1] and the Regulations promulgated thereunder.[2] On December 12, 1969, a license was issued by the Secretary releasing fifty-percent of the blocked assets to Mrs. Stuetzel. The remaining fifty-percent, consisting of cash in the approximate sum of $12,873 and 770 shares of Exxon Corporation stock, was retained in a blocked account at the Bank of Nova Scotia.

Mrs. Stuetzel died on October 31, 1971. Her will devised the blocked assets to Elena Richardson, a niece of Mrs. Stuetzel and a citizen and resident of the United States. The plaintiffs, also citizens and residents of the United States, were named as executors of the decedent's estate.

On June 30, 1972, the plaintiffs applied to the Secretary for a license unblocking the remaining fifty-percent of the assets. This application was denied.

On March 19, 1976, the plaintiffs filed the complaint herein alleging that the refusal to release the assets constitutes a depriva-

1. Section 5(b)(1) of the Trading with the Enemy Act, 50 App. U.S.C. § 5, says that:

"During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through or to any banking institution and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States."

2. These provide:

§ 515.201. Transactions involving designated foreign countries or their nationals; effective date.

(a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of a foreign country designated under this part, or any national thereof, or such transactions involve property in which a foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States:

(2) All transactions in foreign exchange by any person within the United States: and

(3) The exportation or withdrawal from the United States of gold or silver coin or bullion, currency or securities, or the earmarking of any such property, by any person within the United States.

(b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and

(2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

(c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraphs (a) or (b) of this section is hereby prohibited.

(d) For the purposes of this part, the term "foreign country designated under this part" and the term "designated foreign country" mean Cuba and the term "effective date" and the term "effective date of this section" mean with respect to Cuba, or any national thereof, 12:01 a. m., e. s. t., July 8, 1963.

tion of property without due process of law, and that such refusal exceeds the authority granted by the statute, 50 U.S.C.App. § 5.

## I

■ The constitutionality of the Trading with the Enemy Act and the Regulations promulgated thereunder is well established in this Circuit. *Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966);[3] *Teague v. Regional Commissioner of Customs,* 404 F.2d 441 (2d Cir. 1968), cert. denied, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756, rehearing denied, 395 U.S. 930, 89 S.Ct. 1768, 23 L.Ed.2d 251 (1969). These cases are dispositive of plaintiffs' first argument.

## II

Plaintiffs further argue that the Regulations are inconsistent with the Trading with the Enemy Act and that there is no foreign interest that can be frozen by the Treasury Department. They contend that this case should be decided in accordance with a recent Fifth Circuit decision, *Real v. Simon,* 510 F.2d 557 (5th Cir. 1975), rehearing denied, 514 F.2d 738. They argue, as the plaintiffs did in *Real,* that the Regulations are invalid as applied.

Defendants, on the other hand, contend that the Cuban Assets Control Regulations validly prohibit, unless licensed, the trans-

fer of the estate of a deceased Cuban national, blocked prior to his death, even though the claimants are residents or citizens of the United States, and that pursuant to these Regulations this Court lacks jurisdiction to order a transfer of blocked property in the absence of a Treasury license authorizing such a transfer. Accordingly, they argue that the complaint should be dismissed.

■ The permissible scope of review of administrative action is extremely limited; and there is a presumption that actions by an agency in interpreting and applying its own statutes and regulations are valid. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The standard is whether the administrative action is arbitrary, capricious, or an abuse of discretion. *Rochester Telephone Corp. v. U. S.,* 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).

In *Real,* the Fifth Circuit held that the Treasury Regulations were not authorized by the Trading with the Enemy Act. The Court reasoned that where no foreign national claims an interest in the assets the Regulations violate the intent of the Congress in enacting the Trading with the Enemy legislation.

The Court in the *Real* case relied on the Congressional Committee Report in interpreting the Congressional intent. The Court stressed the Committee recommendation that,

---

**3.** As the Court said in *Sardino,* at p. 111:

It does not follow, however, that in dealing with the property of an alien the United States must be blind to the acts of the country of which he is a national; the Constitution protects the alien from arbitrary action by our govment (sic) but not from reasonable response to such action by his own. The world today is not the classical international law world of black squares and white squares, where everyone is either an enemy or a friend. We are not formally at war with Cuba but only in a technical sense are we at peace—as the Havana Conference, held since this appeal was argued, has dramatically shown. The founders could not have meant to tie one of the nation's hands behind its back by requiring it to treat as a friend a country which has launched a campaign of subversion throughout the Western Hemi-

sphere. Compare *Dennis v. United States,* 341 U.S. 494, 561–576, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (concurring opinion of Mr. Justice Jackson). Hard currency is a weapon in the struggle between the free and the communist worlds; it would be a strange reading of the Constitution to regard it as demanding depletion of dollar resources for the benefit of a government seeking to create a base for activities inimical to our national welfare. The Supreme Court's approval of wartime seizure of assets of a non-enemy alien "as a means of avoiding the use of the property to draw earnings or wealth out of this country to territory where it may more likely be used to assist the enemy than if it remains in the hands of this government," *Silesian-American Corp. v. Clark,* 332 U.S. 469, 476, 68 S.Ct. 179, 182, 92 L.Ed. 81 (1947), is broad enough to justify the refusal of a license to Sardino.

"In the committee's view, if the assets are wholly or substantially owned by citizens and residents of United States they should be unblocked, since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban Government. This would be tantamount to using the property of one U.S. citizen to pay the claim of another U.S. citizen."

S.Rep.No.701, 89th Cong., 1st Sess. (1965), U.S.Code Cong. and Admin.News, pp. 3581, 3585.

However, this recommendation referred only to those assets in the United States which were beneficially owned by Americans on or before July 8, 1963, the date that the freeze went into effect. *See Nielsen v. Secretary of the Treasury,* 137 U.S.App. D.C. 345, 424 F.2d 833, 845 (1970).

Furthermore, the Second Circuit has held that the Cuban Assets Control Regulations are authorized under the Trading with the Enemy Act. *Sardino v. Federal Reserve Bank of New York, supra.*

In addition, both the Supreme Court and the Second Circuit have recognized that the Act and the Regulations promulgated thereunder play an important part in this country's foreign policy. In *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court acknowledged (at p. 412, 84 S.Ct. at p. 932),

"[t]he freezing of Cuban assets exemplifies the capacity of the political branches to assure, through a variety of techniques . . ., that the national interest is protected against a country which is thought to be improperly denying the rights of United States citizens."

*See Sardino v. Federal Reserve Bank of New York, supra.*

Finally, it would greatly undermine the effectiveness of this Act if the Courts looked to any date other than the date when the Regulations became effective in determining whether a foreign interest exists. Cuban nationals would otherwise be permitted to sell assets located in America

to Cuban refugees in order to circumvent the Act. The parties could, under *Real,* apply for a Treasury license and effectively free the formerly blocked assets. We cannot presume that Congress intended to create such a loophole.

 In summary, this Court concludes that the Regulations have a basis in law and are within the granted authority. *See Red Lion Broadcasting Corp. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Accordingly, this Court will not order the transfer of property in which a Cuban interest exists where, as in the instant case, there is no Treasury license authorizing such a transfer. *Clark v. Propper,* 169 F.2d 324 (2d Cir. 1948); *Orvis v. Brownell,* 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938 (1953).

For the foregoing reasons, plaintiffs' motion for summary judgment is denied and defendants' motion to dismiss plaintiffs' complaint is granted.