Mario Alfonso TAGLE and Lourdes A. Martinez, Plaintiffs-Appellants,

v.

Donald T. REGAN, as Secretary of Treasury of the United States, Defendant-Appellee.

No. 79–3239.

United States Court of Appeals, Fifth Circuit. Unit B

April 27, 1981.

Cesar R. Camacho, Curtis, Mallet-Prevost, Colt & Mosle, Miami, Fla., for plaintiffs-appellants.

Stephen M. Pave, Miami, Fla., Benjamin C. Flannagan, Gen. Litigation & Legal Advice Sect., Crim. Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before VANCE, HATCHETT and ANDERSON, Circuit Judges.

VANCE, Circuit Judge:

This case comes before us on stipulated facts. Mercedes Tagle y Campos died intestate in Cuba on or about November 9, 1975. She was survived by Lourdes A. Martinez, a daughter and naturalized citizen of the United States, Mario Alfonso Tagle, a son and permanent alien resident in the United States, and Manuel Alfonso Tagle, a son who is a citizen and resident of Cuba. On May 12, 1977, the circuit court of Dade County, Florida entered an order determining that each of the three surviving children was entitled to one-third of the estate.

Included in the estate were assets, consisting of cash and securities, held by the Bank of Nova Scotia in New York. These assets were frozen on July 8, 1963 under the

Cuban Assets Control Regulations, 31 C.F.R. § 515,[1] which were themselves issued under section 5(b) of the Trading With the Enemy Act, 50 U.S.C.App. § 5(b). The two surviving children who resided in the United States applied for a license to unblock their shares of the assets, but the Federal Reserve Bank of New York, acting for the Secretary of the Treasury, (hereinafter cited as "the Treasury") refused their application. Thereafter, they filed suit in district court urging that the Cuban Asset Control Regulations (hereinafter cited as "the Regulations") were no longer in effect, or, alternatively, that they were entitled to the assets regardless of the Regulations. The district court rejected both these contentions. We agree with the district court that the Regulations are still in force, but hold that they do not prevent appellants from receiving their shares of the assets within the United States.

## I.

The validity of the Regulations was first analyzed by this court in *Real v. Simon*, 510 F.2d 557 (5th Cir. 1975). We noted that section 5(b) of the Trading With the Enemy Act authorized the President to issue regulations during a period of national emergency to "prevent or prohibit ... transactions involving ... any property in which any foreign country or a national thereof has any interest ...." 510 F.2d at 559, 560 (quoting 50 U.S.C.App. § 5(b)). We held that the Regulations were authorized because the nation had been "under a declaration of national emergency insofar as the Trading With the Enemy Act" since the Korean crisis in 1950 was declared to be a national emergency by President Truman. *Accord, Nielsen v. Secretary of Treasury*, 424 F.2d 833, 836–38 (D.C.Cir.1970); *Sardino v. Federal Reserve Bank*, 361 F.2d 106, 109–10 (2d Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).

Appellants, however, call attention to the subsequent history of section 5(b). On September 14, 1976 Congress enacted the National Emergencies Act, Pub.L.No.94–412, 90 Stat. 1255 (1976) (codified at 50 U.S.C. §§ 1601 *et seq.*), which terminated "[a]ll powers and authorities possessed by the President ... as a result of the existence of any declaration of national emergency ...." 50 U.S.C. § 1601(a). Section 502(a)(1) of the law, codified at 50 U.S.C. § 1651(a)(1) (repealed), exempted section 5(b) from its coverage.[2] This exemption was then repealed by the Act of December 28, 1977, Pub.L.No.95–223, § 101(d), 91 Stat. 1625. This Act also amended section 5(b) by forbidding the declaration of a national emergency during peacetime. Section 101(b) of the Act, however, contained a grandfather clause.

Notwithstanding the amendment made by subsection (a), the authorities conferred upon the President by section 5(b) of the Trading With the Enemy Act, which were being exercised with respect to a country on July 1, 1977, as a result of a national emergency declared by the President before such date, may continue to be exercised with respect to such country, except that, unless extended, the exercise of such authorities shall terminate (subject to the savings provisions of the second sentence of section 101(a) of the National Emergencies Act) at the end of the two-year period beginning on the date of enactment of the National Emergencies Act. The President may extend the exercise of such authorities for one-year periods upon a determination for each such extension that the exercise of such authorities with respect to such country for another year is in the national interest of the United States.

---

1. The original regulations regarding Cuba were issued in 1962, 27 Fed.Reg. 1116 and 2765. The assets at issue here were frozen pursuant to the more extensive regulations published in 28 Fed. Reg. 6974 (1963).

2. This exemption was inserted at the request of executive officials, who specifically referred,

*inter alia*, to the Regulations. *See* S.Rep.No. 94–1168, 94th Cong., 2d Sess. 7, 31–33, *reprinted in* [1976] U.S.Code Cong. & Ad.News 2288, 2293, 2308–10; S.Rep.No.94–922, 94th Cong., 1st Sess. 10 (1976); H.R.Rep.No.94–238, 94th Cong., 1st Sess. 11, 28 (1975).

The Regulations have been regularly extended, 45 Fed.Reg. 59549 (1980); 44 Fed. Reg. 53153 (1979); 43 Fed.Reg. 40449 (1978).

█ Appellants' argument centers on the phrase "with respect to such country." Appellants concede that the President was authorized to extend the Regulations, but they contend that to do so he was obliged first to declare a state of emergency specifically regarding Cuba. Since the President merely extended the Regulations on the authority of the state of emergency declared in 1950, appellants maintain the extension was invalid.

Legislative history refutes appellants' contention. During hearings on an earlier draft of Pub.L.No.95–223, an attorney from the Office of the General Counsel of the Treasury Department, Leonard Santos, raised precisely this point. He objected to the presence of the word "declared" in connection with the grandfathering clause, and expressed a preference for the word "continued." *Emergency Controls on International Economic Transactions: Hearings on H.R. 1560 and H.R. 2382 and Markup of the Trading With the Enemy Reform Legislation before the Subcomm. on International Economic Policy and Trade of the House Comm. on International Relations*, 95th Cong., 1st Sess. 189–90 (1977). The following colloquy took place:

Mr. Santos: . . .

As I indicated yesterday, it is difficult, considering our present state of negotiations with Cuba and other countries that the President would want to declare a national emergency with respect to those countries.

. . . .

Rep. Bingham: I can see the problem. I personally would not argue that we should ask or expect the President to declare, for the first time, an emergency with respect to Cuba.

*Id.* at 190 (Rep. Bingham chaired the subcommittee).

At the next session of the subcommittee, Rep. Bingham introduced and explained a revision in the draft of the bill.

First of all, title 1 limits the existing Trading with the Enemy Act to situations where there is a declared war, that is for the future. With regard to those situations where these authorities are currently being exercised under the old Trading With the Enemy Act—and I might mention that the principal ones are Vietnam, Cuba, and North Korea, and the freezing of assets of a number of Communist countries, including China as well as a number of Eastern European countries— the tentative judgment of the subcommittee has been that these, in effect, should be grandfathered, subject only to a requirement that as of September of next year, which is the time at which the other emergencies that are covered by the National Emergencies Act expire, the President would simply have to indicate that certain powers which he has been exercising under the Trading With the Enemy Act are to be continued in the national interest. This is the latest of several versions that we have discussed.

We have recognized that it might be embarrassing for the President to have to declare new national emergencies with respect to Cuba and Vietnam. At the same time, if we were to take action here, in effect, terminating those embargoes, we know that this bill, which we hope will not be particularly controversial, would become instantly controversial.

So we have arrived at this proposed compromise, which I hope will be satisfactory to the administration. We would not require the President to declare that the emergency of 1950, under which those powers are now being exercised, continues; we would simply require him to state, beginning in September 1978 and annually thereafter, that such powers are continued in the national interest.

*Id.* at 207–08. This resolution of the matter is embodied in the language of the bill as enacted. We find this legislative history persuasive, and hold that the Regulations are still in force.

## II

We next consider the application of the Regulations to the fact situation before us.[3] We are guided by the language of the Regulations and our previous consideration of an intestate blocking question in *Real.*

Intestate succession is specifically dealt with in the Regulations.

> The term "blocked estate of a decedent" shall mean any decedent's estate in which a designated national has an interest. A person shall be deemed to have an interest in a decedent's estate if he (a) was the decedent; (b) is a personal representative; or (c) is a creditor, heir, legatee, devisee, distributee, or beneficiary.

31 C.F.R. § 515.327.

> Section 515.201 prohibits all transactions incident to the administration of the blocked estate of a decedent, including the appointment and qualification of personal representative, the collection and liquidation of assets, the payment of claims, and distribution to beneficiaries. Attention is directed to § 515.523 which authorizes certain transactions in connection with the administration of blocked estates of decedents.

31 C.F.R. § 515.407.

> (a) The following are hereby authorized:
>
> . . . .
>
> (2) Any transfer to any person by intestate succession;
>
> . . . .
>
> (b) Except to the limited extent authorized by § 515.523 or by any other license or authorization contained in or issued pursuant to this part no transfer to any person by intestate succession . . . shall be deemed to terminate the interest of

the decedent in the property transferred if the decedent was a designated national. 31 C.F.R. § 515.525.

In *Real* this court considered the question of whether the United States assets of a Cuban citizen and resident who had died in Cuba would continue to be blocked under the Regulations when all his intestate heirs were in the United States. Because the heirs were all either American citizens or resident aliens, we opined that section 5(b) of the Trading With the Enemy Act would only be applicable if the decedent retained an interest in his estate after his death. The Treasury contended that the estate was blocked because 31 C.F.R. § 515.327 defines a "blocked estate of a decedent" as one in which any designated national has an interest and further states "[a] person shall be deemed to have an interest in a decedent's estate if he (a) was the decedent . . . ." We concluded that section 515.327 exceeded the authority granted by the Trading With the Enemy Act. We relied in particular on the legislative history of the Act of Oct. 19, 1965, Pub.L. No. 89–262, 79 Stat. 988 (codified at 22 U.S.C. § 1643 *et seq.*) pointing out that the Senate Foreign Relations Committee stated in regard to Cuban assets nominally held by defunct Cuban corporations which are substantially owned by United States citizens:

> In the committee's view, if the assets are wholly or substantially owned by citizens and residents of United States they should be unblocked, since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban Government. This would be tantamount to using the property of one U. S. citizen to pay the claim of another U. S. citizen.

[1965] U.S.Code Cong. & Ad.News 3581, 3585.[4]

---

**3.** The Treasury contends that this issue is not properly before us, since appellants in their statement of issues challenge the Regulations on constitutional grounds only. Even assuming that the Treasury's reading of appellants' position is correct, it is commonplace that "in any case where a ground for decision exists which does not involve constitutionality, that ground and not a constitutional issue should be

the basis for adjudication." *Calhoun v. Cook,* 487 F.2d 680, 683 (5th Cir. 1973).

**4.** The Report indicates that the Treasury should examine each individual case. The record indicates clearly that this was not done with respect to appellants. Their request for a license was denied because "[t]ransactions of this type

Although the committee report dealt with defunct Cuban corporations, we applied the same principles to deceased Cuban individuals in *Real*. The only national interest, among the policies furthered by the Regulations,[5] which the blocking could possibly serve was to retain the funds for vesting by the United States. Since the use of assets beneficially owned by one United States citizen to pay the claims of another was explicitly disapproved by Congress after a request from the Treasury for an expression of congressional views, we rejected the Treasury's rationale. We held that the heirs were entitled to a license to dispose of their portions of the securities.

Although *Real* is instructive, it does not dispose of the case before us. In *Real*, all the surviving heirs lived in the United States. We noted that "[t]his distinction is critical, because we have clear direction from Congress that it is not the intent of this country to use the property of one group of Americans to provide compensation to another group." 510 F.2d at 563. "If one of Urbano Real's heirs presently resided in Cuba, there would be an interest of a foreign national in the blocked account which might, under the *Nielsen* rationale, prevent transfer of any part of the blocked assets." *Id.* at 561. In the present case, one of the surviving heirs is residing in Cuba. We must, therefore, reach the issue left open in *Real*.

### III

*Nielsen* involved the claims of three Cuban refugees, who owned three-fourths of the stock of Acueducto Yateritas, S. A., a Cuban corporation with assets in the United States. Since the remaining shares were owned by Cuban nationals, the Treasury refused to issue a license unblocking the funds. The court of appeals upheld the Treasury's action, stating that "it is at least presumptively acting reasonably, and without being subject to the charge of arbitrary or tyrannical action, if it assumes that assets owned by a Cuban corporation are indeed assets in which there is a Cuban national interest." 424 F.2d at 842.

While we believe *Nielsen* was correctly decided, we do not find it controlling here. The basis for the holding in *Nielsen*, as we noted in *Real*, 510 F.2d at 561, was the entity status of the corporation. The corporation continued to do business after the *Nielsen* plaintiffs had left Cuba. The court summed up the claim it was rejecting as follows:

> In effect applicants argue that they are entitled to require the government to disregard the entity of the Cuban corporation, or its interest in the property held in the name of the corporation, and are entitled to have the rules regulating transfer of that property determined by reference to the position of the shareholders.

424 F.2d at 841. The same consideration does not apply to a decedent's estate. Indeed, the court in *Nielsen* itself distinguished the case of a dry trust or similar legal arrangement. 424 F.2d at 838.

Several lines of analysis reinforce our determination that intestate succession should

---

are not consistent with the present policy of the Government with respect to Cuba."

**5.** In *Real* we identified three basic purposes behind the Trading With the Enemy Act and the Regulations:
> (1) to deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States; (2) to retain blocked funds for possible use or vesting to the United States should such a decision be made; and (3) to use blocked funds for negotiation purposes in discussions with the Cuban government.

*Id.* at 563 (footnotes omitted). We also noted the following list of purposes provided by Goodman, *United States Government Foreign Property Controls*, 52 Geo.L.J. 767, 793 (1964):
> (1) isolating Cuba,
> (2) protecting Cubans from having their assets in the United States confiscated by Cuban authorities,
> (3) preserving Cuban assets for future disposition,
> (4) implementing of our economic defense program by (a) denying Cuba access to dollar earnings and (b) denying Cuba access to dollar financial facilities.

*Real* at 563 n.7.

be treated differently from corporations.[6] First, we note that the Regulations themselves treat corporations, but not estates, as entities. Section 515.302(a)(2) includes within the definition of "designated national" a "partnership, association, corporation, or other organization, organized under the laws of, or . . . controlled by, directly or indirectly, a foreign country and/or one or more nationals thereof . . . ." A decedent's estate is not included in this definition. Instead, under section 515.327 an estate is blocked if a designated national has an interest in it.

Second, we look to regulations issued when the Trading With the Enemy Act was passed, recognizing that "[a] regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent." *National Muffler Dealers Association, Inc. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). The Trading With the Enemy Act has been amended several times, but the Regulations were issued under the form the Act took at the start of World War II, First War Powers Act, ch. 593, § 301, 55 Stat. 839 (1941). On April 21, 1942 the Treasury issued General Ruling No. 12, dealing with foreign funds control. The Ruling barred any unlicensed transfers of blocked assets, with the following exception:

(c) For the purposes of this general ruling:

(1) . . . . the term "transfer" shall not be deemed to include transfers by operation of law.

. . . .

(5) The term "transfer by operation of law" shall be deemed only to mean . . . any transfer to any person by intestate succession . . . .

7 Fed.Reg. 2991–92 (1942). "Since the [1942] regulation is a 'contemporaneous construction of [the Act] by the men charged with the responsibility of setting its . . . machinery in motion,' . . . its interpretation of how [[it]] should be implemented is presumptively correct." *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 648 n.26, 98 S.Ct. 2053, 2063, n.26, 56 L.Ed.2d 591 (1978) (citation omitted).

Finally, there is a useful comparison to be drawn with the converse situation, when an American dies leaving property to designated nationals. Several cases of this sort arose during World War II. In many of these cases, the Alien Property Custodian had vested himself with the "right, title, and interest" of the alien heir or beneficiary,[7] and then sought in court to acquire the assets. The Supreme Court, noting that there was "tacit recognition that acquisition of property by inheritance is compatible with the scheme of the [Trading With the Enemy] Act," *Clark v. Allen,* 331 U.S. 503, 510–11, 67 S.Ct. 1431, 1435–1436, 91 L.Ed. 1633 (1947), allowed the Custodian to take possession. No distinction seems to have been drawn depending on whether all the heirs or beneficiaries were designated nationals, or only some. *See, e. g., Clark v. Edmunds,* 73 F.Supp. 390 (W.D.Va.1947). If an alien's share of a decedent American's estate can be sufficiently separated and

---

**6.** The Supreme Court has frequently devoted its attention to problems arising from the entity status of corporations under the Trading With the Enemy Act, *see Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Kaufman v. Societe Internationale Pour Participations Industrielles et Commerciales. S. A.,* 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853 (1952); *Clark v. Uebersee Finanz-Korporation, A. G.,* 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947); *Behn, Meyer & Co. v. Miller,* 266 U.S. 457, 45 S.Ct. 165, 69 L.Ed. 374 (1925); *cf.* Restatement (Second) of Foreign Relations Law of the United States § 27 (1965)

("A corporation or other private legal entity has the nationality of the state which creates it.")

**7.** The Alien Property Custodian had two types of vesting authorities at his disposal. One was "right, title, and interest" vesting, whereby he acquired whatever rights the designated national had in the property in question. The other was "res" vesting, under which the Custodian took immediate possession of the property. *Compare Zittman v. McGrath,* 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096 (1951) *with Zittman v. McGrath,* 341 U.S. 471, 71 S.Ct. 846, 95 L.Ed. 1112 (1951).

identified to permit its vesting, we think that an American's share of decedent alien's estate should be equally divisible.

■ Having concluded that the *Nielsen* rationale does not apply to intestate succession, we look to the Regulations in light of *Real* to resolve the case before us. Under section 515.327 the estate is blocked for two reasons—both an heir and the decedent are designated nationals. Section 515.525, however, authorizes "any transfer to any person by intestate succession . . . except . . . no transfer to any person by intestate succession . . . shall be deemed to terminate the interest of the decedent in the property transferred if the decedent was a designated national." Thus, it is only the interest of the decedent in the estate, not the interest of the heir, which blocks intestate succession under section 515.525. In *Real* we held that for the government to "determine that a deceased person retains an interest in his estate . . . is arbitrary and without basis in either the language or the purpose of the Trading With the Enemy Act." 510 F.2d at 564. In short, section 515.525 unblocks appellants' shares in the estate insofar as the Cuban heir is concerned, and *Real* unblocks their shares as regards the decedent. Accordingly, we hold that they are entitled to a license from the Treasury.[8]

### IV

The Treasury presents several arguments against this result. First, it contends that *Real* was incorrectly decided. It calls our attention to *Richardson v. Simon*, 560 F.2d 500 (2d Cir. 1977), *appeal dismissed*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 536 (1978), in which a divided panel of the second circuit refused to follow *Real* in a similar fact situation. While recognizing that under our prior panel rule we are bound by the holding in *Real*, the Treasury

urges us not to extend a ruling it maintains was mistaken to begin with.[9]

It is not the usual practice in this circuit for one panel to reexamine the opinion of an earlier panel. Although the prior panel rule does not extend to dicta, *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980), the basic principles of our judicial system suggest that once an issue has been argued and decided, it is not reopened simply because a party claims the logic was incorrect. Since we are extending *Real* to an issue which the *Real* court explicitly reserved, we think it appropriate to determine the extent to which *Real's* analysis of congressional intent applies to the present case. We therefore look to the legislative history of section 5(b) to discover whether there might be any warrant for a regulation defining "interest" so broadly as to allow the "use [of] the property of one group of Americans to provide compensation to another group." 510 F.2d at 563.

The Trading With the Enemy Act was enacted on October 6, 1917 "[f]ollowing much consideration," *Behn, Meyer & Co. v. Miller*, 266 U.S. 457, 462, 45 S.Ct. 165, 69 L.Ed. 374 (1925). The bill "clothe[d] the President with definitely restricted powers in respect of seizing property of those designated as enemies," *Id.* at 462, 45 S.Ct. at 165. The first purpose of the bill was "to recognize and apply concretely, subject to definite modifications, the principle and practice of international law interdicting trade in time of war . . . ," H.R.Rep.No.85, 65th Cong., 1st Sess. 1 (1917), *quoted in Markham v. Cabell*, 326 U.S. 404, 414 n.1, 66 S.Ct. 193, 198 n.1, 90 L.Ed. 165 (1945) (Burton, J., concurring). Shortly after the war, the Supreme Court reviewed the governing principles of international law:

---

**8.** Any attempt by the Cuban heir to withdraw his share of the assets remains blocked by section 515.201.

Our holding on this point is based on the Regulations as modified by *Real*. We need not and do not reach the question of whether the Treasury could, consistent with the Trading With the Enemy Act and congressional intent,

revise the Regulations to block intestate succession in situations such as this one.

**9.** In other instances the Treasury has amended its regulations in response to judicial decisions, *compare State of the Netherlands v. Federal Reserve Bank*, 201 F.2d 455, 457–58 (2d Cir. 1953) *with* 18 Fed.Reg. 2079 (1953). It did not choose to do so in response to *Real*.

The purpose of the restriction is not arbitrarily and unnecessarily to tie the hands of the individuals concerned, but to preclude the possibility of aid or comfort, direct or indirect, to the opposing forces. It is that purpose which gives birth to the rule and indicates its limits. The rule is simply "a belligerent's weapon of self-protection." . . . . The whole tendency of modern law and practice is to soften the "ancient severities of war," and to recognize, increasingly, that the normal interrelations of the citizens of the respective belligerents are not to be interfered with when such interference is unnecessary to the successful prosecution of the war. Private rights and duties are affected by war only so far as they are incompatible with the rights of war.

*Sutherland v. Mayer*, 271 U.S. 272, 287–88, 46 S.Ct. 538, 540, 70 L.Ed. 943 (1926).

Two points are clear. First, "[t]he purpose [of the Act] was to weaken enemy countries by depriving their supporters of power to give aid." *Miller v. Robertson*, 266 U.S. 243, 248, 45 S.Ct. 73, 75, 69 L.Ed. 265 (1924). "The intention is to make it impossible to aid our enemy by forbidding that money or property of any kind held in this country should reach the hands of the enemy." 55 Cong.Rec. 4858 (1917) (remarks of Rep. Snook). Second, Congress sought to "mitigate" international law where practical. H.R.Rep.No.85, 65th Cong., 1st Sess. 2 (1917) *quoted in Markham v. Cabell*, 326 U.S. at 414 n.1, 66 S.Ct. at 198 n.1. "[T]he normal interrelations of the citizens of the respective belligerents are not to be interfered with when such interference is unnecessary to the successful prosecution of the war." *Sutherland v. Mayer*, 271 U.S. at 288, 46 S.Ct. at 540.

Congress also discussed a second purpose of the law. "Another object of the legislation . . . is to protect the rights and property of enemies and allies of enemies." 55 Cong.Rec. 4858 (1917) (remarks of Rep. Snook). Members of Congress were well aware of the important role foreign investment had played in American economic development, *see* 55 Cong.Rec. 4864, 4924

(1917) (remarks of Rep. Hulbert); *see generally* Quintana and Pfeffer, *Foreign Investment in the United States: A Nineteenth Century Perspective*, 17 Stan.J.Int'l L. 45 (1981). Consequently, they wished to avoid any actions which might discourage the resumption of such investment after the war. "[T]he taking over and custody of the [alien] property by the Government gives to the enemy the best possible protection." S.Rep.No.111, 65th Cong., 1st Sess. 9 (1917). *Accord*, S.Rep.No.113, 65th Cong., 1st Sess. 9 (1917); H.R.Rep.No.85, 65th Cong., 1st Sess. 4 (1917). Although aware that "[t]here is no constitutional prohibition against confiscation of enemy properties," *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 11, 47 S.Ct. 1, 4, 71 L.Ed. 131 (1926), "the theory on which the bill [was] drafted [was] that enemy property [should] be protected and utilized, but not confiscated . . . ." S.Rep.No.111, 65th Cong., 1st Sess. 9 (1917). *Accord*, S.Rep.No.113, 65th Cong., 1st Sess. 9 (1917); 55 Cong.Rec. 4857 (1917) (remarks of Rep. DeWalt).

In summary, the Trading With the Enemy Act as originally conceived was designed to cause as little disruption as possible to normal relations with enemy aliens, consistent with the aim of keeping assets out of enemy hands. There is no suggestion that assets passing to Americans should be restricted in any way. Even the suggestion that property owned by aliens be used to satisfy American claimants as part of a general settlement met with controversy, 55 Cong.Rec. 4857 (1917) (remarks of Reps. Snook and Stafford). That assets belonging to Americans might be used to satisfy such claims seems never to have occurred to anyone.

Section 5(b) of the Trading With the Enemy Act was amended by the Supplement To the Second Liberty Bond Act, ch. 176, § 5, 40 Stat. 966 (1918), by the Act of March 9, 1933, ch. 1, § 2, 48 Stat. 1 (1933), and by S.J.Res. 252, ch. 185, 54 Stat. 179 (1940). During passage of the latter amendment, the theme of protecting foreign investors was restated with a new emphasis.

The act of 1917 gave the President the power to restrict transactions in the war emergency situation, so that no transfer could be made by citizens of another country owning property here without a license from the Government. The purpose of that was to protect the property of innocent foreigners in this country from being—to use a very frank word—looted.

86 Cong.Rec. 5008 (1940) (remarks of Sen. Wagner). *See also Orvis v. Brownell*, 345 U.S. 183, 187, 73 S.Ct. 596, 598, 97 L.Ed. 938 (1953).

The onset of World War II produced still another amendment to section 5(b), the First War Powers Act, 1941, ch. 593, § 301, 55 Stat. 839. This amendment served two chief purposes. "[First]—and this is the principal difference between this law and the one we had during the last war—the President may hold and use—that is the new part—or sell such [alien] property for the benefit of the United States." 87 Cong. Rec. 9862 (1941) (remarks of Rep. Gwynne). *Accord* H.R.Rep.No.1507, 77th Cong., 1st Sess. 2–3 (1941), *quoted in Markham v. Cabell*, 326 U.S. at 411, 66 S.Ct. at 196; S.Rep. No.911, 77th Cong., 1st Sess. 2 (1941); 87 Cong.Rec. 9838, 9861, 9865 (1941) (remarks of Sen. Van Nuys, Reps. Hancock and Kefauver). The second purpose was to reach hidden enemy interests. "This possibility of enemy taint of nationals of neutral powers, particularly of holding companies with intricate financial structures, which asserted rights to American assets was of deep concern to the Congress when it broadened the Trading With the Enemy Act in 1941 '. . . to reach enemy interests which masqueraded under those innocent fronts.'" *Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357

U.S. 197, 204–05, 78 S.Ct. 1087, 1091–1092, 2 L.Ed.2d 1255 (1958) (quoting *Clark v. Uebersee Finanz-Korporation, A. G.*, 332 U.S. 480, 485, 68 S.Ct. 174, 92 L.Ed. 88 (1947)).

Congress, however, was concerned only with enemy assets, or assets that might be used by the enemy. "We find not the slightest suggestion that Congress was concerned under this Act with property owned or controlled by friendly or neutral powers and in no way utilized by the Axis." *Uebersee Finanz-Korporation*, 332 U.S. at 487, 68 S.Ct. at 177. *See also Kaufman v. Societe Internationale Pour Participations Industrielles et Commerciales, S. A.*, 343 U.S. 156, 159–60, 72 S.Ct. 611, 612–613, 96 L.Ed. 853 (1952).

Thus, while the 1941 amendment extended presidential authority under the Act, it did not alter the Act's basic goals. Both the 1917 Congress and the 1941 Congress clearly expressed their intention to restrict application of the Act to foreign nationals and to avoid adverse impacts on American interests. While the precise questions presented here and in *Real* do not seem to have been considered, we think the correctness of *Real's* analysis is manifest. "[T]he statute under which the funds are to be 'held, administered and accounted for' . . . is not a confiscation measure . . . ." *Zittman v. McGrath*, 341 U.S. 471, 473–74, 71 S.Ct. 846, 847, 95 L.Ed. 112 (1951). We find no warrant in the Act for any attempt by the Treasury to use the assets which properly belong to American heirs to compensate other Americans. The heirs "have an interest which Congress has indicated should not be confiscated merely because some others who have like interest are enemies." *Kaufman*, 343 U.S. at 160, 72 S.Ct. at 613.[10]

10. As we have already mentioned, the Trading With the Enemy Act was amended once more, Act of December 28, 1977, Pub.L.No.95–223, § 101, 91 Stat. 1625. Sometimes the reenactment of a law, and in particular the grandfathering of the existing authorities exercised under it, would create a presumption that Congress had approved the administrative regulations. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . . ." *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978). The legislative history makes it clear, though, that the 1977 amendment was not intended to reflect in any way on substantive questions. "[T]his is essentially a bill establishing procedure, and not a bill that sets out or judges specific policies." 123 Cong.Rec. 22477 (1977) (remarks of Rep.

To accept the Treasury's assertion that the statute authorizes it to vest the assets of some Americans to satisfy the claims of others would also raise serious fifth amendment constitutional problems. "It is well settled that this [C]ourt will not pass on the constitutionality of an Act of Congress if a construction of the statute is fairly possible by which the question may be avoided." *United States v. Clark,* 455 U.S. 23, 27, 100 S.Ct. 895, 899, 63 L.Ed.2d 171 (1980). "Considering that confiscation is not easily to be assumed, a construction that avoids it and is not barred by a fair reading of the legislation is invited." *Guessefeldt v. McGrath,* 342 U.S. 308, 319, 72 S.Ct. 338, 344, 96 L.Ed. 342 (1952) (construing Trading With the Enemy Act). We decline to adopt a construction of the statute which is not compelled by its language or indicated by its history, and which would require us to make constitutional determinations. *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533 (1979).

### V

The Treasury offers three other arguments in support of their position. They claim that any judicial transfer of assets is barred by *Propper v. Clark,* 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1941). *Propper* involved a dispute over copyright royalties for performances of musical compositions. The Treasury relies on the following language from the opinion for their contention:

The freezing order of June 14, 1941, immobilized the assets covered by its terms so that title to them might not shift from person to person, except by license, until the Government could determine whether those assets were needed for prosecution of the threatened war or to compensate our citizens or ourselves for the damages done by the governments of the nationals affected.

337 U.S. at 484, 69 S.Ct. at 1340.

Aside from the fact that the Court restricted its holding in *Fropper* to transfers of credit,[11] the language cited by the Treasury simply does not support their position. *Propper* forbids transfer of title to frozen assets without a license. The Florida court, however, did not transfer title, but simply determined claims under state law. As long as enforcement of these claims is conditioned upon obtaining a license, this procedure is not in conflict with *Propper. See Zittman v. McGrath,* 341 U.S. 446, 464, 71 S.Ct. 832, 842, 95 L.Ed. 1096 (1951); *Lyon v. Singer,* 339 U.S. 841, 70 S.Ct. 903, 94 L.Ed. 1323 (1951). As for our ruling here, we are not ordering the transfer of assets without a license, but rather determining whether the Treasury can, consistent with the Regulations and the authorizing legislation, properly deny a license. Nothing in *Propper* suggests that this is a nonjusticiable question, or that the extent of the Treasury's authority under the Trading With the Enemy Act is nonreviewable.

Next, the Treasury suggests that denying a license in cases such as this one serves other purposes besides using the blocked funds to reimburse other Americans. It argues that the rights of Cuban creditors of

---

Whalen). The decision to avoid any discussion of or judgment about the merits of the government's Cuban policies recurs throughout the subcommittee hearings, e. g., "I would rather not get drawn into a discussion of Cuban policy ...," *Hearings, supra,* at 117 (statement of Julius L. Katz, Assistant Secretary of State for Economic and Business Affairs); "The staff has presumed that our function here was to reform the procedures and authorities involved, but not to try to deal with the existing uses of these authorities." *Id.* at 167 (statement of Roger Majak, subcommittee staff director); "We do not want to do that [raise the merits of the substance of the existing uses of the Act], at least that is my view and I think it is the view of the members of the subcommittee." *Id.* at 189 (statement of Rep. Bingham, subcommittee chairman). The Supreme Court has refused to find congressional approval implicit in statutory reenactments in circumstances far more ambiguous than these, *see, e. g., SEC v. Sloan,* 436 U.S. 103, 119–121, 98 S.Ct. 1702, 1712–1713, 56 L.Ed.2d 148 (1978).

11. "We do not now undertake to say whether every determination of rights concerning blocked property in unlicensed litigation is voidable." *Propper v. Clark,* 337 U.S. at 486, 69 S.Ct. at 1341.

the estate may be infringed upon should any assets be distributed. While the Treasury agrees that these creditors could bring suit in United States courts, *see, e. g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), it maintains that these creditors could reasonably have relied on the freezing order to protect their interests. The only regulation which specifically protects the rights of creditors, though, is unrelated to decedent's estates.[12] We see no reason to insert into the Regulations a second form of legal protection for designated nationals for the purpose of depriving American citizens and residents of their property.

■ The Treasury's most persuasive argument centers, not on the facts of this case, but on plausible future variants thereof.[13] It raises the possibility of testate succession, or of inter vivos gifts. These possibilities troubled the district court in *Ferrera v. United States*, 424 F.Supp. 888 (S.D.Fla. 1976).[14] Although this court does not resolve issues which are not before it, we think it important to stress two distinctive features of both this case and *Real*. First, appellants have asserted and the Treasury has not denied that the transfer of assets here is gratuitous. Obviously, the Regulations could be easily evaded and congressional purposes thwarted were it permissible for unblocked individuals to purchase blocked assets from designated nationals and then claim them from the Treasury. Second, appellants have asserted and the Treasury has not denied that this inheritance came naturally. There is no indication of any intent by the Cuban government to use this succession to shift assets from one person to another; there are no deathbed adoptions or legitimization proceedings, no marriages or divorces. Appellants have a burden of showing that they are essentially innocent recipients of property rights before a license need be granted.[15] In the case before us, this burden has

12. 31 C.F.R. § 515.557 Accounts of Cuban partnerships.

Specific licenses are issued unblocking partnerships established under the laws of Cuba as follows:

(a) Where all of the general partners and limited partners, if any, have emigrated from Cuba and have established residence in the United States or in a country in the authorized trade territory, specific licenses are issued unblocking the assets of the partnership *after deducting total debt due creditors wherever located.*

(b) Where one or more partners, whether general or limited, is still in Cuba (or elsewhere but still blocked), specific licenses are issued unblocking only the net pro-rata shares of those partners who are residents in the United States or in a country in the authorized trade territory *after deducting the total debt due creditors wherever located.* (Emphasis added).

This provision seems to be limited to partnerships. In regards to Cuban corporations substantially owned by United States citizens, the shareholder seeking a license must provide information as to the status of corporate debts, but the value of such debts is not deducted, § 515.555.

13. Although the Treasury did not argue the point in its brief, we are of course fully aware of the deference due to an agency's interpretation of the statute under which it operates. But "regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977).

[T]he courts are the final authorities on issues of statutory construction, ... and "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."

*SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978) (citation omitted). In addition, as we have already observed, the Treasury's interpretation of its authority is neither contemporaneous with the statute's enactment, nor consistent with its earlier views. These facts considerably reduce the deference paid to its current position, *see Southeastern Community College v. Davis*, 442 U.S. 397, 411 n.11, 99 S.Ct. 2361, 2370 n.11, 60 L.Ed.2d 980 (1979); *General Electric Company v. Gilbert*, 429 U.S. 125, 142–43, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976).

14. In *Ferrera* the Cuban heirs had sought to transfer their shares of the estate to the unblocked United States heir. Our decision should not be read as suggesting that the court was incorrect in denying a license for those portions of the estate.

15. Other reasons may also exist to deny a license.

No contention is advanced here that appellants intend to use the blocked account for or

been met. Appellants are entitled to a license.

REVERSED and REMANDED.

on behalf of the Cuban government. If the United States had a reasonable basis to believe this were the case, it would be proper to deny appellants access to the blocked assets. 510 F.2d at 563.