UNITED STATES of America, Plaintiff,

v.

Midgalia FERNANDEZ–PERTIERRA, Defendant.

No. 81–233–Cr–JWK.

United States District Court, S. D. Florida.

Sept. 30, 1981.

David S. Hammer, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Stephen Kogan, Miami, Fla., for defendant.

## MEMORANDUM ORDER ON MOTION TO DISMISS

KEHOE, District Judge.

The Court must determine the validity of the Indictment filed against the defendant, Midgalia Fernandez-Pertierra, in this criminal prosecution which arose under the somewhat unusual factual circumstances involved in this case. The defendant is charged in a two count Indictment with violations of the Trading With the Enemy Act, 50 U.S.C.A.App. § 1 et seq., and its implementing regulation, 31 C.F.R. § 515.-415 (1980).[1] Specifically, Count I of the Indictment charges the defendant with having conspired to engage in transactions in

---

1. Criminal prosecution is authorized under the act (and regulation). 50 U.S.C.A.App. § 16 (West Supp.1981). The defendant is subject to a maximum penalty of 10 years imprisonment and a $50,000 fine. Also see 31 C.F.R. § 515.-701 (1980) (which refers to the penal clause contained in § 5(b) and subsequently amended

connection with the transportation of Cuban nationals from Cuba to the United States without obtaining a license from the Office of Foreign Asset Control. Count II of the Indictment charges that the defendant engaged in a specific transaction involving the transportation of Cuban nationals from Cuba to the United States, also without first obtaining a license from the Office of Foreign Asset Control.

The defendant has filed a motion to dismiss, challenging this Indictment, contending that the regulation sought to be enforced is unconstitutional on its face, and as applied to the facts of this case, and, furthermore, that the Indictment fails to properly charge an offense under the laws of the United States. The Government has fully responded to the motion and the arguments raised. Because of the importance of the issues involved in this matter, the Court accorded the parties full oral argument and an opportunity to submit supplementary memoranda.

The Court has reviewed the various authorities cited in the memoranda submitted, as well as those authorities obtained through independent research. The Court now concludes that the regulation codified at 31 C.F.R. § 515.415 (1980) is constitutional on its face and as applied to the facts alleged, and that the Indictment correctly charges an offense against the United States.

## I.

The defendant was indicted for activities that resulted from the so-called "Freedom Flotilla" or "Mariel Boatlift" which occurred last year and in which hundreds of privately owned vessels transported approximately 125,000 Cuban refugees to Key West, Florida. For a factual background into the events surrounding the Mariel Boatlift, and out of which this case arose, see *United States v. Anaya*, 509 F.Supp. 289 (S.D.Fla.1980) (*en banc*); *Pollgreen v. Morris*, 496 F.Supp. 1042 (S.D.Fla.1980). Suffice it to say for purposes of this case that the defendant is charged with engaging in activities involved in the boatlift and causing the transportation of refugees to the United States in willful violation of the Trading With the Enemy Act (hereinafter also the "TWEA") and its implementing regulations, the Cuban Assets Control Regulations.[2] The relevant portions of the Indictment charge the following overt acts:

\* \* \* \* \* \*

1. Beginning on or about August 17, 1980 and continuing until on or about September 20, 1980, at 10710 S.W. 55th Terrace, Miami, Florida, the defendant MIGDALIA FERNANDEZ, accepted approximately $130,735.00 from individuals who wished to have specific Cuban nationals brought to the United States.

2. Beginning on or about August 17, 1980, and continuing until on or about September 20, 1980, at 10710 S.W. 55th Terrace, Miami, Florida, the defendant MIGDALIA FERNANDEZ, helped compile "reclamante lists," that is lists of specific Cuban nationals who were to be brought from Cuba to the United States.

3. Beginning at a date unknown, but at least on or about August 17, 1980, and continuing through September, 1980, the defendants, MIGDALIA FERNANDEZ and RAFAEL SALVI-LIMA, made arrangements to have motor vessels travel from the United States to Cuba in order to bring specific Cuban nationals to the United States. These motor vessels included the *Jim Dandy*, the *Hawk-e* (sic) *Tropica* and the *Big Trojan*.

4. In late August or early September, 1980, the defendant, RAFAEL SALVI-LIMA, took the motor vessel *Jim Dandy* to the Port of Mariel in Cuba, in order to bring specific Cuban nationals to the United States.

in 1977 by increasing the fine from $10,000 to $50,000. Pub.L. 95–223, 91 Stat. 1626.

2. The codified regulations are published at 31 C.F.R. Part 515 (1980).

5. During September, 1980, the defendant, RAFAEL SALVI–LIMA, spent approximately $1,800 on expenses and supplies in Cuba, while the motor vessel *Jim Dandy* lay in the Port of Muriel.[3]

\*   \*   \*   \*   \*   \*

In her motion, the defendant contends that the Indictment should be dismissed since the Cuban Assets Control Regulation under which she was charged, 31 C.F.R. § 515.415, is unconstitutional on its face and as applied since: (a) it is an unconstitutional exercise of executive power; (b) it denies the defendant equal protection in the absence of any rational basis for its promulgation; (c) it is arbitrary and capricious; and (d) it is vague and overbroad. The defendant also contends that the Indictment fails to state a crime or charge an offense since the transportation of refugees that allegedly took place did not violate any law of the United States. The Court has carefully examined all of these contentions and considers them to be without merit for the reasons which follow.

## II.

The Trading With the Enemy Act was originally enacted as a war measure on October 6, 1917, and provided, *inter alia*:

\*   \*   \*   \*   \*   \*

During the time of war *or during any other period of national emergency declared by the President,* the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

\*   \*   \*   \*   \*   \*

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States[.] (emphasis supplied)

\*   \*   \*   \*   \*   \*

50 U.S.C.A. App. § 5(b)(1), ch. 106, § 5(b), 40 Stat. 415, as amended by Act of March 9, 1933, ch. 1, § 2, 48 Stat. 1; Act of December 18, 1941, ch. 593, Title III, § 301, 55 Stat. 839.

Until 1977, the plain language of the act clearly stated that it was to be applicable not only during time of war, but also during any declared period of national emergency. The substance of Section 5(b) allows the President, or his designee,[4] to prohibit transactions with specified nations, or to license such transactions.

■ On December 16, 1950, President Truman declared the existence of a national emergency.[5] The continued existence of this national emergency has been formally recognized by subsequent Presidents over the last 30 years.[6] For purposes of enforce-

---

**3.** The defendant Midgalia Fernandez is not charged with going to Cuba herself to transport Cuban nationals to this country. Rather, it is the Government's contention that she formulated the plan that resulted in defendant Salvi-Lima's voyage to Cuba and back as part of the boatlift. Co-defendant Salvi-Lima has not yet been arrested and is not presently before the Court.

**4.** The authority to promulgate implementing regulations under the TWEA was delegated to the Secretary of the Treasury. Executive Order 9193, July 6, 1942, 7 Fed.Reg. 1409. Regulations are issued by the Secretary of the Treasury upon recommendation of the Director of

The Office of Foreign Assets Control, the agency charged with the responsibility of enforcement. *31 C.F.R. § 515.806 (1980).*

**5.** Proclamation 2914, 64 stat. A454, 3 C.F.R. 1949–53 Comp.

**6.** To retain these authorities, the President must annually determine that their continued exercise is in the national interest, Pub.L. 95–223, § 101(b). President Carter most recently did this on September 8, 1980. 3 C.F.R. 334 (1981). Also see President Eisenhower, Executive Order No. 10896, November, 1960, 3 C.F.R. 1959–63 Comp. and Executive Order No. 10905, January 14, 1961, 3 C.F.R. 1959–63 Comp. Pres-

ment under the Cuban Assets Control Regulations, a state of emergency presently exists.[7]

On December 28, 1977, Section 5(b) of the TWEA was again amended. This amendment, Pub.L. 95–223, Title I, §§ 101(a), 102, 103(b), 91 Stat. 1625, made significant changes in the act. Primarily however, it removed the authority from the President to restrict transactions with foreign nations by declaring a national emergency under the TWEA. Following the adoption of this amendment, all national emergencies must be declared pursuant to the provisions of the National Emergencies Act of 1977.[8]

The amendment was in response to, among other things, the "extensive use by Presidents of emergency authority under Section 5(b) of the Trading With the Enemy Act of 1917 to regulate both domestic and international economic transactions unrelated to a declared state of emergency[.]" S.Rep.No. 95–466, 95th Cong., 1st Sess., reprinted in [1977] U.S.Code Cong. & Ad. News 4540, 4541. The amendment did, however, allow the President to continue exercising those authorities conferred upon him by Section 5(b) "which were being exercised with respect to a country on July 1, 1977, as a result of a national emergency declared by the President before such date[.]" Section 101(b) of Pub.L. 95–223, 91 Stat. 1625. By this "grandfather" provision, the President, or his designee, continues to possess the authority to issue regulations pertaining to Cuba. Accordingly, the Cuban Assets Control Regulations, originally promulgated in 1963, and supplemented

from time to time since then, continue to have the force and effect of law, notwithstanding the 1977 amendment to the TWEA deleting the authority to issue new regulations as a result of a national emergency declared after July 1, 1977.

■ The TWEA itself was designed to prohibit trade with an enemy[9] without obtaining a license by the Office of Foreign Asset Control, and to provide authority for the control, regulation and seizure of enemy property located in the United States.[10] The constitutional basis for confiscating and regulating enemy assets without compensation appears to rest on the war powers of the Congress.[11] It is settled that the Government is authorized to obtain criminal convictions for violations of the act. 50 U.S.C.A.App. § 16 (West Supp.1981); *United States v. Quong*, 303 F.2d 499 (6th Cir.), cert. denied, 371 U.S. 863, 83 S.Ct. 119, 9 L.Ed.2d 100 (1962); *United States v. China Daily News*, 224 F.2d 670 (2d Cir.), cert. denied, 350 U.S. 885, 76 S.Ct. 138, 100 L.Ed. 780 (1955); *United States v. Broverman*, 180 F.Supp. 631 (S.D.N.Y.1959). Civil actions arising from the TWEA have also been entertained by the courts since the promulgation of the Cuban Assets Control Regulations in 1963. See e. g. *Tagle v. Regan*, 643 F.2d 1058 (5th Cir. 1981); *Real v. Simon*, 510 F.2d 557 (5th Cir. 1975); *Nielsen v. Secretary of the Treasury*, 424 F.2d 833 (D.C.Cir.1970); *Teague v. Regional Commissioners of Customs*, 404 F.2d 441 (2d Cir. 1968); *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106 (2d Cir. 1965).

---

ident Johnson, Executive Order No. 11387, January 1, 1968, 3 C.F.R. 1966–70 Comp.

**7.** Any possible contention that the state of emergency has become "stale" has been laid to rest. *Sardino v. Federal Reserve of New York, infra; Welch v. Kennedy*, 319 F.Supp. 945 (D.D.C.1970), rev'd on other grounds sub nom. *Welch v. Shultz*, 482 F.2d 780 (D.C.Cir.1973). Accord, *Tagle v. Regan*, 643 F.2d 1058 (5th Cir. 1981).

**8.** Pub.L. 94–412; 90 Stat. 1255; 50 U.S.C.A. §§ 1601 et seq. (West Supp.1981).

**9.** The argument that Cuba is not a formal "enemy" of the United States and hence, cannot be

the subject of restricted trade under the act has been rejected by the Courts. See e. g. *Sardino v. Federal Reserve Bank of New York*, infra at 111–112.

**10.** See generally, Sawyier, Encouraging Foreign Investment in the United States by Permitting the President's Emergency Authority under the Trading With the Enemy Act, 27 Mercer L.Rev. 681 (1976); Note, Cuban Assets Control Regulations, 8 Harv. Int'l L.J. 144 (1967).

**11.** U.S.Const. Art. I § 8, cl. 11; *Silesian-American Corp. v. Clark*, 332 U.S. 469 (1947).

## III.

The specific part of the Cuban Assets Control Regulations under which the defendant is charged, Section 515.415, titled "Travel to Cuba; Transportation of certain Cuban Nationals," was promulgated on May 19, 1980, in response to the Mariel Boatlift.[12] Its purpose was to prohibit certain activities in connection with the transportation of undocumented Cuban aliens to this country, namely:

1. transactions incident to travel to, from or within Cuba;

2. transportation of vessels or aircraft to Cuba or to the United States from Cuba;

3. transportation of property belonging to Cubans; and

4. transactions involving the provision of payments or goods and services to Cubans, or the receipt of payments of goods and services from Cubans.[13]

This regulation expressly interprets the general prohibitory regulation contained in that chapter, 31 C.F.R. § 515.201,[14] which

12. The fact that this regulation was issued *after* the 1977 Amendment to the TWEA does not effect its validity since the regulation relates back to the national emergency declared by President Truman and reaffirmed by subsequent Presidents. See note 6, supra.

13. The regulation states in full:

§ 515.415 Travel to Cuba; transportation of certain Cuban Nationals.

(a) The following transactions are prohibited by § 515.201 when in connection with the transportation of any Cuban national, except a Cuban national holding an unexpired immigrant or non-immigrant visa or a returning resident of the United States, from Cuba to the United States, unless otherwise licensed:

(1) Transactions incident to travel to, from, or within Cuba;

(2) The transportation to Cuba of a vessel or aircraft;

(3) The transportation into the United States of any vessel or aircraft which has been in Cuba since the effective date, regardless of registry;

(4) The provision of any services to a Cuban national, regardless of whether any consideration for such services is furnished by the Cuban national;

(5) The transportation or importation of baggage or other property of a Cuban national;

(6) The transfer of funds or other property to any person where such transfer involves the provision of services to a Cuban national or the transportation or importation of, or any transactions involving, property in which Cuba or any Cuban national has any interest, including baggage or other such property;

(7) Any other transaction such as payment of port fees and charges in Cuba and payment for fuel, meals, lodging; and

(8) The receipt or acceptance of any gratuity, grant, or support in the form of meals, lodging, fuel, payments of travel or maintenance expenses, or otherwise, in connection with travel to or from Cuba or travel or maintenance within Cuba.

(b) Transactions incident to the travel to the United States of Cuban nationals traveling without a visa issued by the Department of State are not authorized under the provisions of § 515.564.

(c) Transactions described in paragraph (a) of this section are not "transactions ordinarily incident to travel to and from Cuba" within the general license of § 515.560.

14. § 515.201. Transactions involving designated foreign countries or their nationals; effective date.

(a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of a foreign country designated under this part, or any national thereof, or such transactions involve property in which a foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All transfers of credit and all payments between, by, through, or to any banking institution or banking institutions whatsoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States;

(2) All transactions in foreign exchange by any person within the United States; and

(3) The exportation of withdrawal from the United States of gold or silver coin or bullion, currency or securities, or the earmarking of any such property, by any person within the United States.

(b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings,

bans economic transactions with Cuba and Cubans without prior approval of the Government of the United States. Such approval is ordinarily forthcoming by means of a license issued by the Office of Foreign Assets Control.

While this is the first reported case construing the applicability of Section 515.415 in a criminal prosecution, there have been cases upholding the constitutionality of the Cuban Assets Control Regulations in general. For example, in *Sardino v. Federal Reserve Bank of New York*, supra the court held, *inter alia*, that the Trading With the Enemy Act which supplied the authority for the Cuban Assets Control Regulations, was not an unconstitutional delegation of legislative powers. The Court further held that the Constitution was not violated by the President's delegation of his power to issue regulations to the Secretary of the Treasury and the latter's delegation of administration of the regulations to the Office of Foreign Assets Control.[15]

More recently, the Fifth Circuit, in *Real v. Simon*, supra, also had the occasion to construe the constitutionality of these regulations issued pursuant to the TWEA. In *Real*, the plaintiffs were the surviving heirs of a Cuban national and resident who died intestate with a securities account in the United States. The surviving spouse was an alien living in this country. The remaining plaintiffs were decedent's children and grandchildren, all naturalized American citizens. The securities, along with all other assets in the United States owned by the Cuban Government or Cuban nationals, was frozen or "blocked" by the promulgation of the Cuban Assets Control Regulations and actions taken by the Government pursuant to those regulations. The plaintiff spouse of the decedent did obtain a license from the Treasury Department, giving her title and possession of one-half of the securities account. The other half of the securities account remained blocked and became the subject of litigation. The district court upheld the Treasury Department's refusal to unblock the remaining portion of the securities account.

Plaintiffs raised, as their first contention on appeal, that the Cuban Assets Control Regulations were void as applied to them because the regulations lacked express congressional authorization. They contended that the Foreign Assistance Act of 1961, Pub. L. 87–195, September 4, 1961, 75 Stat. 424, authorizing the President to establish and maintain a trade embargo with Cuba, was an intervening act of Congress which implicitly modified the TWEA to narrow the range of economic sanctions Congress intended to impose on Cuba. The appellate court, in response to this contention, not only adopted the *Sardino* holding that the Cuban Assets Control Regulations are authorized under the TWEA, but went on to hold that the Foreign Assistance Act of 1961 was not inconsistent with the TWEA and that no portion of the legislative history of the 1961 act indicated either an explicit or implicit intention on the part of Congress to limit executive attempts to respond to the Cuban crisis:

instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and

(2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

(c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraphs (a) or (b) of this section is hereby prohibited.

(d) For the purposes of this part, the term "foreign country designated under this part" and the term "designated foreign country" mean Cuba and the term "effective date" and the term "effective date of this section" mean with respect to Cuba, or any national thereof, 12:01 a. m., e.s.t., July 8, 1963.

15. See note 4, supra.

Absent clear and unequivocal evidence of such intent, we are unwilling to announce a limitation of the President's powers to conduct the foreign affairs of this country. [footnotes omitted] We find no inconsistency in the two acts, and believe that the Foreign Assistance Act of 1961 should be viewed as bolstering, rather than limiting, the powers of the Executive Branch to deal with the Cuban problem. Our conclusion that the regulatory scheme in general has statutory authorization does not, however, decide the issue whether the application of the regulations to the unique facts of this case is consistent with the legislation from which the regulations derive their power.

*Real,* supra at 560–61.

While admittedly, the events leading to the prosecution of the defendant in this action are unusual and certainly not within the original contemplation of the Congress which enacted the TWEA, the Court can discern no reason why the broad purposes behind the statute and regulations should not apply here to permit the Government to prosecute this defendant. Although both *Sardino* and *Real* were civil cases concerned with other provisions of the Cuban Assets Control Regulations, the application of the standard developed in those cases provides a virtually unqualified grant of authority to the President to regulate foreign commerce with Cuba and prohibit the kind of activity allegedly engaged in by the defendant.[16]

### IV.

Recent Supreme Court cases confirming other aspects of the exercise of executive power in foreign affairs lend support to this Court's decision to uphold the challenged statute and its implementing regulations. These cases continue the long judicial tradi-

tion of sustaining the exclusive power of the President in the sphere of international relations. See *Dames & Moore v. Regan,* —— U.S. ——, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (upholding the President's power to nullify prejudgment attachments against the Government of Iran and directing those persons holding blocked Iranian funds and securities to transfer them to the Federal Reserve Bank for ultimate transfer to Iran); *Haig v. Agee,* —— U.S. ——, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (confirming executive authority to revoke a passport on the ground that the holder's activities in foreign countries are caused or are likely to cause serious damage to the national security or foreign policy of the United States).

In *Dames & Moore, supra,* which also involved a judicial interpretation of the TWEA, the Court observed that there were tensions present in the exercise of foreign policy in our system of government; tensions better resolved by the executive:

[W]e are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provision of the Constitution.

*Id.* supra —— U.S. at ——, 101 S.Ct. at 2978 (quoting from *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319–320, 57 S.Ct. 216, 220–21, 81 L.Ed. 255 (1926)).

■ The defendant has asserted no argument, nor advanced any authority, to per-

---

**16.** In a recent opinion construing the reach of the TWEA in a civil action, *Tagle v. Regan,* supra, the 5th Circuit revisited the law developed in *Real* (challenged by the Government in *Tagle*) and extended the *Real* holding to authorize the licensing under the Cuban Assets Control Regulations of designated Cuban nationals (one of whom presently resides in Cuba) in order to allow them to acquire certain frozen

assets held in the United States and blocked by the Government pursuant to the regulations. For our purposes, *Tagle* is instructive in that it reaffirmed the current validity of these regulations issued pursuant to the TWEA and provides additional analysis of the legislative intent behind the enactment of the TWEA and recent amendments thereto.

suade the Court to abandon this general judicial policy of deference to the executive in the area of foreign relations for purposes of this particular case. Finally, based upon the authorities cited throughout this memorandum order, it is the Court's determination that 31 C.F.R. § 515.415 was validly issued pursuant to the TWEA and this regulation is rationally related to the broad purposes of the act; that it is not arbitrary or capricious, nor vague or overbroad. In short, the regulation is a legitimate exercise of executive power under our constitution.

## V.

One remaining contention raised in defendant's motion warrants comment. She also maintains that the Indictment fails to state a crime or charge an offense since the Cuban refugees transported under her auspices were not Cuban nationals. The definition of "national" is contained in 31 C.F.R. § 515.302(a) and provides:

> The term "national" shall include: (1) A subject or citizen of, or any person who has been within, a foreign country, whether domiciled or resident therein or otherwise at any time on or since the "effective date," [i. e. July 8, 1963].

Defendant contends that this definition of "national" as it relates to commerce and transactions affecting commerce is inconsistent with the definition of "national" in the immigration sense; that it is too expansive; that it is inconsistent and in conflict with 8 U.S.C.A. § 1101(a)(21), in which, for immigration purposes, Congress defined a "national" to be "a person owing permanent allegiance to a state."

■ There is nothing inconsistent with a separate and differing application of definitions within the enforcement of an act which on the one hand relates to commerce as distinguished from another act which relates to immigration. Section 515.415 also relates to commerce and is founded upon a definition of the word "national" which has been in the regulation for use within the scope of the TWEA since July 8, 1963. Accordingly, the Court finds that the Cuban Refugees transported through de-

fendant's efforts were "nationals" for purposes of the TWEA.

## VI.

For the reasons expressed in this order, it is

ORDERED AND ADJUDGED that the motion to dismiss the Indictment is DENIED.